**BANK LEUMI TRUST COMPANY OF NEW YORK, Plaintiff,**

v.

**Milton LANG and Elena Lang and MEA Investments, Defendants.**

**No. 91–8004–CIV–HOEVELER.**

United States District Court,
S.D. Florida.

July 28, 1995.

Hilarie Bass and Paul A. Shelowitz, Greenberg, Traurig, Hoffman, Lipoff, Rosen & Quentel, P.A., Miami, FL, for plaintiff.

Gary Brookmyer, Miami, FL, for defendants.

HOEVELER, Senior District Judge.

This Cause comes before the Court on Plaintiff's Amended Post–Judgment Petition to Invalidate Claimed Exemptions, Authorize Execution on Assets and Obtain Declaratory Relief.

## A. Factual Background

Plaintiff, Bank Leumi Trust Company of New York ("Bank Leumi"), is a New York banking institution with its principal place of business in New York. Defendants, Milton Lang and Elena Lang (the "Langs"), are Florida residents.[1] Prior to 1990, the Langs were New Jersey residents who owned and operated an educational training business. They obtained approximately $1,800,000 in financing from Bank Leumi in exchange for corporate promissory notes and personal guarantees executed by Defendants.

The Langs' business filed for bankruptcy in 1989 after experiencing financial difficulties. In April 1990, Bank Leumi filed suit in the United States District Court for the District of New Jersey to collect the debt owed by the Langs on the basis of their personal guarantees. On April 21, 1990 Defendants entered into a sales contract to purchase a home in Palm Beach Gardens (the "Palm Beach Gardens home").

In May 1990, the Langs sold their Farview Road house in New Jersey for $940,000. Subsequently, between August 1990 and October 1990, they purchased approximately $500,000 worth of annuities (the "annuities"), which are statutorily exempt from execution by creditors.[2] Fla.Stat. § 222.14. In September 1990, Bank Leumi filed a motion for Summary Judgment in the District of New Jersey. The following month, Defendants closed on the Palm Beach Gardens home,

paying $522,000 in cash and according to Defendants, incurring additional expenses of approximately $178,000.

On November 2, 1990, Bank Leumi obtained a $1.8 million judgment against the Langs. On January 7, 1991, Bank Leumi domesticated the Judgment against the Langs in this district,[3] and filed this post-judgment petition seeking to enforce the judgment against Defendant's assets, specifically the Palm Beach Gardens home and the annuities.

## B. Post–Judgment Petition is an Appropriate Vehicle for Enforcing a Judgment

As a preliminary matter, Defendants contend that Plaintiff has improperly brought this Post–Judgment Petition. Rule 69 of the Federal Rules of Civil Procedure requires that post-judgment procedures on execution follow state law. The Langs assert that there is no procedure for bringing a post-judgment petition for executing on a judgment in the state of Florida; instead, Plaintiffs should have brought an independent lawsuit.

Defendants, however, have overlooked a pertinent procedural rule—Florida Rule of Civil Procedure 1.570 provides that the enforcement of final judgments for recovery of property shall be by a writ of possession for real property and by a writ of replevin, distress writ, writ of garnishment, or other appropriate process or proceedings for other property. Rule 1.570 also provides for the enforcement of money judgments by execution, writ of garnishment, or other appropriate process or proceedings. The general nature of the proceedings contemplated by this Rule would certainly encompass the action

---

1. This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 since there is complete diversity of citizenship between the parties and the matter in controversy exceeds the sum of $50,000 exclusive of interests and costs. Venue is proper in this District, pursuant to 28 U.S.C. § 1391, as this is the District within which the Defendants reside and in which certain of the transferred property is located.

2. Mr. Lang did not recall the exact amount of the annuities purchased but believed that they were

worth about $300,000. The record supports a larger figure; Defendants' 1990 federal tax return indicates that they did not hold any pensions or annuities, while their 1991 return indicates that the value of their pensions and annuities were $509,113.

3. This Judgment was domesticated in this court pursuant to 28 U.S.C. § 1963, which provides for the registration of judgments in the district courts from any other district court.

brought by Plaintiff. Consequently, it is proper for the Plaintiffs to proceed on the basis of a Post–Judgment Petition.

## C. Invalidation of Claimed Assets

Plaintiff seeks to invalidate Defendants' pre-judgment purchases of the Palm Beach Gardens Home and the annuities. It asserts that prior to the entry of Judgment in the District of New Jersey, Defendants "convert[ed] their non-exempt New Jersey assets into purportedly exempt Florida assets, in the form of annuities and a Florida homestead, apparently with the intent of placing all of their otherwise non-exempt assets out of Bank Leumi's reach." In response, Defendants contend that Plaintiffs may not execute against their property in Florida because its homestead is exempted by Article X of the Florida Constitution and its annuities are exempted by Fla.Stat. § 222.14. This case thus presents two central issues: 1) whether the Langs purchased exempt assets in Florida in order to defraud their creditors and defeat their interests; 2) even if the purpose of these transactions was fraudulent in nature, whether the Langs may nonetheless avail themselves of the homestead exemption and the statutory exemption for annuities.

## D. Findings of Fact

On August 22, 1994, the Court held an extensive evidentiary hearing and has reviewed the record. The Court concludes that Defendants converted their non-exempt assets into exempt assets for the sole purpose of hindering and avoiding their creditors and defeating their claims.

The purchase of a homestead in Florida and of exempt annuities does not suffice, by itself, as evidence of specific intent to defraud. However, these transactions, in conjunction with other surrounding circumstances, leave no doubt that the Langs had the intention to defeat and avoid the claims of creditors. The timing of the transactions in question is the most telling evidence of the Langs' state of mind. Defendants first became aware that Bank Leumi intended to commence legal proceedings against them in April 1990. Within six months of Plaintiff's filing suit in the District of New Jersey, the Langs had transferred their non-exempt assets into exempt ones in Florida. The Court notes that the Langs entered into a sales contract to purchase the Palm Beach Gardens home and made a down payment from a mortgage placed on their New Jersey home in the same month that Plaintiff filed suit. The timing of these transactions strongly suggest that the Langs decided to take advantage of Florida's generous exemption laws once it became apparent to them that their creditor would move against their personal assets.[4] Additionally, there is no indication in the record that Mr. Lang had a prospect of employment in Florida when he decided to move to this state.

At the hearing, Mr. Lang claimed that he established residence in Riviera Beach, Florida in 1989, approximately one year before the transactions in question.[5] However, his assertion is contradicted by the record. In a letter to Vision Mortgage Corp., dated March 16, 1990, Mr. Lang stated that "I live in Tenafly, N.J. at the above address, which is my only residence. I will, as usual be taking extended vacations and business trips to Florida several time a year." The Court finds that this document is more probative of Mr. Lang's actual residence in 1990 than his own testimony.[6]

Moreover, the nature of the investments involved is a further indication of the Langs'

---

4. New Jersey does not have a homestead exemption. Under New Jersey state law, a lien is created upon the real property of the judgment debtor's real estate from the date the judgment is docketed. *In re Blease*, 605 F.2d 97, 98 (3rd Cir.1979) (quoting N.J.S.A. § 2A:16–1).

5. In an effort to establish his ties to Florida, Mr. Lang stated that his wife's sister lives in Florida and that his son entered the University of Florida in June 1990.

6. While it could be true (although unlikely) that Mr. Lang was a Florida resident in 1990 and believed that he had to claim New Jersey residency in order to acquire a mortgage for his New Jersey home, his willingness to misrepresent his state of residence casts doubts upon his credibility as a witness.

intent to delay, hinder or defraud. Of the myriad of investment vehicles available, the Langs chose ones that their creditors would have difficulty reaching.[7] Moreover, at the time that Defendants purchased the annuities in question, they were experiencing financial difficulties, having declared their business bankrupt in 1989. One is persuaded to conclude that individuals in Defendants' financial position would not elect to lock their money in annuities, unless the exempt status of these investments was their principal attraction.

It also appears that Defendants have attempted to conceal assets from their creditor. Defendants obtained a $600,000 mortgage on the Farview Road Home in March 1990, three months before they sold this house. Apparently, that money was used largely as a down payment to purchase the Palm Beach Gardens home. The Court is troubled by the fact that Defendants have not adequately explained what they did with the mortgage proceeds. In a deposition in 1990, Mr. Lang stated that he used the $600,000 mortgage to live on and to pay legal fees. In the Hearing on Order to Show Cause before the Honorable Peter R. Palermo on July 18, 1994, Mr. Lang stated that he did not owe anything on the Farview Road Home when he sold it in 1990. However, on cross-examination, he stated that the $600,000 mortgage "slipped his mind" and that he repaid the mortgage when he sold the Farview Road Home. Finally, in the hearing before this Court on August 22, 1994, Mr. Lang stated that he may have used some of the mortgage proceeds to purchase the Palm Beach Gardens home, but he was not certain how much.

Mr. Lang's shifting positions concerning the $600,000 mortgage proceeds suggest that Defendants have not been upfront about their financial dealings with either Plaintiff or this Court. It would appear that they have attempted to mislead their creditors about their financial position. These efforts to conceal the mortgage proceeds are a fur-

ther indication that Defendants have engaged in efforts to hinder, delay or defraud creditors.

At the hearing, the Court heard confusing and conflicting testimony concerning purported loans made by Defendants' son, Alexander, to his parents. Mr. Lang testified that he borrowed $200,000 from his son's trust fund to purchase the Farview Road home in New Jersey. According to Mr. Lang's testimony, Defendants repaid Alexander this sum when they sold the New Jersey home in 1990, but then borrowed a roughly equal sum from Alexander to purchase the Palm Beach Gardens home.

Defendants' version of this purported loan is partially supported and partially contradicted by the record. First, while Defendants claim that they originally borrowed $200,000 to purchase the Farview Road house, there are no documents that confirm this sum. They provided the Court with a hand-written promissory note dated July 19, 1984 in which they promise to pay Alexander $40,000 in return for a security interest in the Farview Road house.[8] Second, there is no documentation that the Langs repaid the $200,000 loan. Third, on July 12, 1990, Defendants signed a promissory note to Alexander in the amount of $213,333 which was secured by Defendants' bank accounts, securities, stocks and bonds. Although this money was purportedly used to purchase the Palm Beach Gardens home, Defendants did not list Alexander on the title for the Palm Beach Gardens home, nor did they provide him with a security interest in the property.

In assessing the significance of these purported loans from Alexander to Defendants, it is unnecessary for the Court to determine whether these loans were part of Defendants' continuing scheme to defeat creditors' claims. Instead, the Court agrees with Plaintiff's analysis that even if these loans were legitimate transactions, they have no bearing on whether Defendants fraudulently converted

---

7. The Court notes with interest that Defendants paid for the Palm Beach Gardens home with $522,000 in cash. While it is not illegal to purchase a home with cash, it does raise the inference that Defendants were attempting to shield this money from their creditors' claims.

8. The Court notes with interest that this document was not notarized, nor were they any witnesses to its signing.

non-exempt assets into exempt assets. At most, the evidence proffered establishes that Defendants borrowed a substantial sum from their sons' trust without giving Alexander a security interest in the property acquired. Consequently, Alexander is an unsecured creditor who must establish his priority against other creditors.

## E. Conclusions of Law

The Court's determination that the Langs intended to defeat their creditors' claims presented a relatively facile task. Assessing the legal implications of this finding is more problematic, given the muddled state of this area of the law. *See* R. Wade Wetherington, *Eleventh Hour Conversions: A Journey into the Labyrinth of Prebankruptcy Planning,* Fla.B.J., January, 1995, at 18. Nonetheless, the Court concludes that the Palm Beach Gardens home is exempt from Bank Leumi's claims, while the annuities are not.

### 1) Homestead Exemption

Article X, Section 4(a) of the Florida Constitution states:

> There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for the house, field or other labor performed on the realty, the following property owned by a natural person:
>
> (1) a homestead ...

This provision, which shields homestead owners from creditors' claims, contains three explicit exceptions to this protection. Defendants argue that these exceptions should be read narrowly and note that this provision does not contain an exception for fraudulent conduct.

■ After reviewing the case law in this area, the Court concludes that under Florida law, the Langs are entitled to the protection provided by the Homestead Exemption, even if their purpose was to defeat Bank Leumi's claims. The Florida Supreme Court recently addressed the scope of the homestead ex-

emption in *Butterworth v. Caggiano,* and found that a homestead is exempt from civil or criminal forfeiture under the Florida Racketeer Influenced and Corrupt Organizations Act. 605 So.2d 56, 61 (Fla.1992). The Supreme Court noted that "Florida courts have consistently held that the homestead exemption in article X, section 4, must be liberally construed." *Id.* at 58. The Court interpreted strictly the three exceptions contained in the homestead exemption, and found that "forfeitures are not excluded from the homestead exemption because they are not mentioned, either expressly or by reasonable implication, in the three exceptions that are expressly stated." *Id.*

■ Similarly, the homestead exemption does not contain an exception for real property which is acquired in the state of Florida for the sole purpose of defeating the claims of out-of-state creditors. In light of the Supreme Court's admonition in the *Caggiano* that the three exceptions to the homestead exemption should be read narrowly, this Court is unwilling to graft an additional exception.

The Court does not agree with Plaintiff's assertion that *Caggiano* has been overruled by the Florida Supreme Court's most recent decision interpreting the homestead exemption. *Palm Beach Savings & Loan Association v. Fishbein,* 619 So.2d 267 (Fla.1993). Nowhere in the opinion does the Supreme Court state that it intends to upset the holding in *Caggiano.* Moreover, *Fishbein* presents a factual situation which differs from the facts of both *Caggiano* and the present case. In *Fishbein,* a husband borrowed $1,200,000 from a bank and secured the loan with a mortgage on his Palm Beach home. He forged his wife's signature on the mortgage documents without the knowledge of either his wife or the bank. The husband then used $930,000 of the loan proceeds to pay off existing mortgages on the property. The Supreme Court imposed an equitable lien of $930,000 upon the property, which represented the amount of the original mortgages. The Court reasoned that although Mrs. Fishbein had not engaged in fraud, the original mortgages would have encumbered the homestead if Mr. Fishbein had not fraudu-

lently obtained the loan from the bank. Mrs. Fishbein was therefore not entitled to the windfall which would result if the homestead was accorded exempt status. *Id.* at 270–71.

*Fishbein* applies to a narrow range of circumstances in which a creditor steps into the shoes of a predecessor creditor who could have availed himself of an exception to the homestead exemption. Moreover, the proceeds which were procured fraudulently from the bank must be used to pay off the obligations of the original creditor. *See* Greta K. Kolcon, *Common Law Equity Defeats Florida's Homestead Exemption,* Fla.B.J., Nov. 1994, at 56 (discussing the limited impact of *Fishbein* ). Since neither of these conditions are present in either *Caggiano* or the present case, *Fishbein* is not applicable law.

Plaintiff argues that the homestead exemption may not be interpreted to make it an instrument of fraud and cites several cases for this proposition. *See, e.g., Jones v. Carpenter,* 90 Fla. 407, 106 So. 127 (1925); *Gepfrich v. Gepfrich,* 582 So.2d 743 (Fla. 4th DCA 1991); *La Mar v. Lechlider,* 135 Fla. 703, 185 So. 833 (1939). In *Caggiano,* the Supreme Court of Florida addressed and rejected the exact argument presented by the Plaintiff in this case. The court stated:

> The State cites a number of cases for the proposition that Florida courts have refused to allow the homestead exemption to shield property where there is fraud or other reprehensible conduct. In particular, the State cites cases where the courts have imposed equitable liens on homesteads ... Virtually all of the relevant cases [cited by the state where a court has imposes a lien upon the homestead] involve situations that fell within one of the three stated exceptions to the homestead provision. Most of the cases involve equitable liens that were imposed where proceeds from fraud or reprehensible conduct were used to invest in, purchase or improve the homestead. *See, e.g., Jones v. Carpenter,* [90 Fla. 407] 106 So. 127, 130 (1925); *La Mar,* 185 So. 833, 836.

*Caggiano,* 605 So.2d at 60.

This Court has reviewed the cases cited by Plaintiff and concludes that in the cases where Florida courts have imposed equitable liens on the basis of fraudulent, illegal, or improper conduct, those seeking homestead protection have fraudulently or improperly procured funds and then sought to defeat the claims of those to whom monies were due by using the monies to invest in, purchase or improve a homestead. For example, in *Jones v. Carpenter,* the defendant, a president of a bread company, tortiously converted corporate funds in order to make improvements on his recently-acquired home. The Florida Supreme Court permitted the corporation's creditors to place an equitable lien on the property. 90 Fla. 407, 106 So. 127 (1925). In *Ryskind v. Robinson,* the court reversed an entry of summary judgment against a creditor who "sought to have a lien established upon the homestead property contending that she was fraudulently induced to lend monies which were specifically used to pay off certain mortgage indebtedness on the property." 302 So.2d 427, 428 (Fla. 4th DCA 1974).

As stated earlier, in its two most recent opinions interpreting the homestead exemption, the Florida Supreme Court has imposed equitable liens only where a debtor fraudulently procured funds to invest in a homestead. In *Fishbein,* the husband obtained a loan for the bank by forging his wife's signature on the loan documents. 619 So.2d at 271. In contrast, the Court in *Caggiano* declined the invitation to cause a forfeiture of a homestead because *inter alia* "no illegal proceeds were used to purchase, acquire or improve Caggiano's property." 605 So.2d at 61.

In this case, Plaintiff has not offered evidence to show, nor does it contend, that Defendants borrowed the $1,800,000 with the intent to put that money into the Florida house and the annuities, and thus defeat Plaintiff's ultimate claims. In the several cases cited by Plaintiff, this distinction, as far as the Homestead property is concerned, is crucial. Here, the money was borrowed for a legitimate purpose—for a business which ultimately failed. Following that failure, Defendants seek to defeat creditors' proper claims to their own funds by the investments made in Florida. Pursuant to the Florida Supreme Court decisions, Defendants suc-

ceed as far as the Homestead is concerned. While this result appears to negate basic concepts of fairness, the long line of Florida cases dealing with the subject leave no alternative. The same is not true of the annuities.

Plaintiff also relies upon cases which fall into a different but equally inapplicable category—those in which a husband has sought to invoke the homestead exemption in order to thwart his wife's ability to collect alimony or child support. *See, e.g., Rosenblatt v. Rosenblatt,* 635 So.2d 132 (Fla. 3d DCA 1994); *Gepfrich v. Gepfrich,* 582 So.2d 743 (Fla. 4th DCA 1991); *Radin v. Radin,* 593 So.2d 1231 (Fla. 3d DCA 1992); *cf. Isaacson v. Isaacson,* 504 So.2d 1309 (Fla.App. 1 Dist. 1987). In these case, Florida courts have imposed equitable liens because they were concerned that a husband should not be able "to hide behind the homestead exemption laws." *Gepfrich,* 582 So.2d at 744. Certainly, the facts of the present case do not implicate the equities of domestic relations, and these cases are therefore inapposite.

Once again, the cited cases present situations where monies directly due others were put into the property to prevent its recovery. As suggested, these cases present situations not only impressed with the policy of protecting the family but which also come closer to those cases where one is using money which in law belongs to another to put that money beyond the reach of others. Once again, this is the delicate but seemingly clear distinction made by the Florida courts in giving effect to the homestead exemption.

In conclusion, Plaintiff has not presented a Florida state case in which a Florida court has imposed an equitable lien upon a homestead as a result of a debtor's converting non-exempt assets into a homestead. Accordingly, although this Court is reluctant to place its imprimatur upon conduct which, beyond question, was an effort to delay, hinder or defraud, it is obligated to follow Article X, Section 4(a) of the Florida Constitution. It therefore holds that Defendants' homestead is exempt from its Plaintiff's claim.

2) Exemption for Annuities

■ Plaintiff also seeks to invalidate Defendants' acquisition of annuities shortly before the Judgment in the District of New Jersey. Florida law provides annuity contracts with a wide exemption from garnishment, attachment and legal process. In contrast to the Homestead Exemption, which is of a constitutional nature, the exemption for annuity contracts is statutory. Fla.Stat. § 222.14 states:

[T]he proceeds of annuity contracts issued to citizens or residents of the state, upon whatever form, shall not in any case be liable to attachment, garnishment or legal process in favor of any creditor of the person whose life is so insured or of any creditor of the person who is the beneficiary of such annuity contract, unless the insurance policy or annuity contract was effected for the benefit of such creditor.

While Plaintiff does not contest that the securities purchased by Defendants qualify as annuities under the Florida Statute, it argues that Defendants are not entitled to this exemption because they have engaged in fraudulent conduct.

Federal bankruptcy courts have denied this exemption to annuity contracts where it is shown that the beneficiary of the exemption has converted non-exempt assets into exempt annuities with the intent to hinder, delay or defraud creditors. *See In re Mackey,* 158 B.R. 509 (Bankr.M.D.Fla.1993); *In re Schwarb* 150 B.R. 470 (Bankr.M.D.Fla.1992). The defendant in *In re Mackey* used proceeds from the sale of a dealership property to purchase annuities. The court stated that "the conversion of non-exempt assets into exempt assets is not fraudulent per se. However, when the conversion is done with intent to defeat the interests of creditors, it is sufficient to deny debtor's claims of exemption." 158 B.R. at 511.

■ In assessing the intentions of the debtor, a court should consider the circumstances of the conversion, in particular "the timing of the conversion from non-exempt to exempt property and any attempts by debtor to conceal the conversion." *Id.; see also In re Schwarb,* 150 B.R. 470 (Bankr.M.D.Fla.

1992); *In re Swecker,* 157 B.R. 694 (Bankr. M.D.Fla.1993).

In *In re Mackey,* the court found that the debtor intended to hinder, delay or defraud her creditors because *inter alia* she drove one hundred miles to purchase annuities one day after she received the proceeds from the sale of the auto dealership. She filed for Chapter 7 relief one month later. The court was also impressed by the fact that she was "well aware of the effect of placing funds into annuities." 158 B.R. at 513. Similarly, in *In re Schwarb,* debtors sold non-exempt real estate and mutual funds at the beginning of 1992, and purchased annuities thereafter. They then declared Chapter 11 bankruptcy on February 7, 1992. 150 B.R. at 471–72. In denying the annuities exempt status, the bankruptcy court found, based on "the relevant time frame", that the debtor had undertaken a "systematic conversion of assets" to protect them from his creditor. *Id.* at 473.

It is of interest to note, in finding a distinction between the homestead exemption and the annuities problem, that the Florida courts have wrestled with the homestead exemption problem under consideration here, giving the impression, viewing the cases broadly, that but for the constitutional dignity afforded the exemption and the specificity of its exceptions, the Court would enlarge its approach to these cases and further limit the reach of the exemption. It is cases which present facts such as those here which put in question the broadness of the Florida Supreme Court's approach to the constitutional homestead exemption. The frustrations engendered by the more extreme cases are apparent in the efforts of the Court to explain "fraudulent intent" as that term applies to the exemptions and to seek more avenues to prevent inequitable results. As to the homestead exemption, however, the instant case does not enjoy the benefit of one of those avenues.

This is not so as to the Florida statute which exempts annuities. Fla.Stat. § 222.14. This statute is part of the chapter which now includes Fla.Stat. § 222.30. § 222.30 provides that any conversion of non-exempt assets to exempt assets is a fraudulent asset conversion if the debtor made the conversion with the intent to hinder, delay or defraud the creditor. Although § 222.30 is not directly applicable to the present case, it has been stated that "the enactment of [Fla.Stat.] § 222.30 did little to alter the law. At most it served the useful function of codifying an existing line of authority eliminating any doubt there may have been as to the law." David E. Peterson et al., *Is the Homestead Subject to the Statute of Fraudulent Asset Conversions?,* Fla.B.J., Dec., 1994, at 15. *See also* Fla.Stat. § 222.29 (1993) and Fla. Stat. § 726.105(a) (1987) *et seq.* (relating to fraudulent transfers). While not directly applicable, these legislative efforts lend support to the position that § 222.30 reflects the trend of the law prior to 1993. While it can be and has been argued that Fla.Stat. § 222.30 would not have been necessary if the law was such before its enactment, that argument has little support. In *Slatcoff v. Dezen,* a case in which the cash surrender value of the policy was held exempt, the Florida Supreme Court stated:

It is universally held that the exemption laws were 'designed for the honest debtor,' 22 Am.Jur., Exemptions, Section 140, and we stated long ago that the provision of our exemption statutes, while they should be liberally construed, should not be so applied as to become an instrument of fraud upon creditors. *Pasco v. Harley,* 73 Fla. 819, 75 So. 30. But we must assume that the debtor is honest unless and until the contrary is established ... The further suggestion that the statute [Fla.Stat. § 222.14] is subject to abuse for failing to provide a ceiling on the amount of cash surrender value exempted we also find to be without merit, because the amount which the debtor invests in insurance is a factor to be considered as relevant to, although not in itself conclusive of, the issue of fraud. And proof of fraud operates as a permanent brake upon the misuse of the exemption laws.

76 So.2d 792, 793–94 (Fla.1954).

Further, if indeed "it is universally held that the exemption is designed for the honest debtor," and if "proof of fraud" operates as a permanent brake upon misuse of the exemption, then the view that Fla.Stat. § 222.30

reflected existing law when passed seems quite persuasive.

 Here, the circumstances of the annuity purchases make it quite evident that Defendants' principal purpose was to evade their creditors. The amount of money put into annuities is pertinent. In what could be described as almost one "fell swoop," they have liquidated assets, secured a million or more dollars, paid for a new home with cash ($550,000) and in spite of Mr. Lang's difficulty remembering, bought approximately $500,000 worth of annuities. While this may not be fraud in the strict sense, such conduct appears to qualify for that description as it relates to a pursuing creditor; and clearly there was an effort to hinder or delay. Can it be argued with validity that Defendants are the debtors which the Supreme Court referred to as those for whom the law was designed to protect? I think not. Therefore, I find as a matter of fact and law that Plaintiff has met its burden of persuasion as to its claim against the annuities purchased by Defendant.

Defendants assert that there is no Florida law which addresses the conversion of non-exempt assets to annuities, and that it is improper for the Court to rely upon these federal bankruptcy decisions. This position has been addressed above. I see no reason why I should not look to bankruptcy cases; not only are these cases factually analogous, but their legal reasoning for invalidating the annuity contract exemption in certain cases is persuasive. The Court has previously found that Defendants purchased the annuities in order to hinder, delay or defraud their creditors. It is therefore appropriate to deny them the exemption under Fla.Stat. § 222.14.

F. *Complicity of Elena Lang*

 In Defendants' response to Bank Leumi's Consolidated Post–Trial Memorandum of Law, the Langs argue that "there is no showing whatsoever that Elena Lang has in any way participated in the alleged fraud ... Without such a showing, there can be no exception to Elena Lang's entitlement to enjoy the homestead exemption." Defendants' assertion, however, flies in the face of the record before this Court. Mrs. Lang signed the 1991 tax return indicating that her husband and she were the owners of the annuities in question. Moreover, she is also a signatory to the sales contract for the Palm Beach Gardens home. Having participated in these transactions, Mrs. Lang cannot claim that she was ignorant of the material benefits of moving herself and her assets from New Jersey to Florida.

Moreover, the Court held an evidentiary hearing at which Mrs. Lang had an opportunity to testify. She elected not to take the stand or to subject herself to cross-examination. While I will not speculate about Mrs. Lang's silence, it is too late now for her to protest her lack of involvement. Accordingly, the rulings in this order apply equally to Mr. and Mrs. Lang.

The Court hereby finds that Defendant's Palm Beach Gardens home is exempt from Plaintiff's claims. However, the Court hereby invalidates the exemptions claimed by Defendants for the annuities and authorizes Plaintiff to execute on these assets.

DONE and ORDERED.