**In re Sandra Rodhouse KRAVITZ, Debtor.**

**Bankruptcy No. 97–41925.**

United States Bankruptcy Court, D. Massachusetts.

May 29, 1998.

Joseph C. Delcore, Everett, MA, for Debtor.

Stephan M. Rodolakis, Peters, Massad & Rodolakis, Worcester, MA, Trustee.

## OPINION

JAMES F. QUEENAN, Jr., Bankruptcy Judge.

Relying on a Florida homestead exemption, Sandra Rodhouse Kravitz (the "Debtor") seeks to exempt from the bankruptcy estate the entire value of her residence at 609 Yawl Lane, Longboat Key, Sarasota, Florida (the "Florida property").[1] She values the property at $625,000 and lists as its sole encumbrance a mortgage to First Presidential Savings & Loan Association of Florida with a current balance of $84,320.[2] Be-

1. Begun by Cadle's involuntary petition on March 25, 1997, the case is in Massachusetts because the bankruptcy case of the Debtor's husband is pending in this court. With the consent of the Debtor, an order for relief was entered in her case on June 23, 1997. The court granted the Debtor her discharge on November 12, 1997. Her husband has been denied his discharge be-

cause of his violation of discovery obligations, including perjury. The two cases are jointly administered.

2. The Florida property is the Debtor's principal asset. She also lists in her schedules various items of personal property having a total value of $14,450, including jewelry valued at $6,000,

fore the court is the Debtor's motion for summary judgment on the objection to the claim of exemption filed by Cadle Company of Ohio, Inc. ("Cadle").[3]

Cadle is the only unsecured creditor listed in the Debtor's schedules. It contends the Debtor's exemption claim is invalid because her recorded declaration of homestead was done solely to defraud Cadle and as part of an elaborate course of conduct designed for the same purpose. Cadle's objection to the exemption sets forth this conduct in some detail. In the Debtor's memorandum accompanying her motion, she states that she assumes the allegations in the objection "to be true for the sake of this motion." I do the same.

## I. FACTS

Cadle's objection tells a vivid story of pursuit and evasion. By purchase from the FDIC as receiver of Boston Trade Bank, Cadle holds two 1987 promissory notes of Kravitz and Company, Inc. (the "Company") totaling $250,000 in face value and secured by an all-asset security agreement with the Company. Cadle also holds personal guaranties signed by the Debtor and her husband, Eugene Kravitz ("Eugene"), both of whom were shareholders and officers of the Company. The Company was in the wholesale jewelry business, operating from premises in the "Jewelers' Building," 333 Washington Street, Boston, Massachusetts.

By October of 1993 the Company was in default under the notes. In that month, in violation of its security agreement, the Company transferred all of its inventory, furniture and equipment (having a total value of $343,046.62) to DKR Realty Trust ("DKR"), which had recently purchased a condominium in the Jewelers' Building.[4] The Debtor is

the Trustee of DKR; her three children are the beneficiaries. The Company immediately moved to DKR's premises and conducted its business there. On August 30, 1994, Eugene incorporated GDI Trading, Inc. ("GDI"), naming himself as president and listing DKR's condominium as GDI's address. GDI thereafter conducted the same business previously operated by the Company, using the Company's assets and telephone listing. The Debtor was Treasurer and Clerk of GDI. She actively participated in its business operations and had check-signing authority over bank accounts of both GDI and DKR.

The Debtor and Eugene purchased the Florida property in 1987, placing title in their joint names. At the time of the purchase they granted a $430,000 mortgage to Presidential Savings & Loan Association of Florida.[5] They thereafter used the Florida property as a vacation home. On August 5, 1994, the Debtor and Eugene granted a $100,000 mortgage on it to one Howard Kravitz, of Princeton, New Jersey. At her § 341 meeting the Debtor was unable to answer any questions concerning this mortgage, which she failed to list in her bankruptcy schedules. Her counsel stated at the meeting that the mortgage was not "an issue" and was "invalid."

In December of 1994 Cadle made demand upon the Debtor and Eugene for payment under their personal guaranties. On January 24, 1995 they conveyed the Florida property to themselves as trustees of Yawl Lane Trust, under declaration of trust dated January 1, 1994, for a stated consideration of less than $100. The post office address of the trust set forth on the deed was 531 Concord Street, Sudbury, Massachusetts. At her § 341 meeting the Debtor was unable to name the trust's beneficiaries.

---

which is described as "Estimate [sic] value, subject to actual appraisal." This does not include a $5,000 diamond ring which the Debtor admits she owns. The debtor claims an exemption of $1,000 in personal property pursuant to Fla. Const. art. X, § 4(a)(2), which allows an exemption in any personal property to the extent of $1,000.

**3.** The court not having ordered otherwise, Bankruptcy Rule 7056 on summary judgment governs this contested matter. Fed.R.Bankr.P. 9014.

**4.** DKR's condominium is at present being offered for sale at $350,000; there is a $100,000 mortgage on the property.

**5.** This mortgage also covered nearby property which has since been sold. The Debtor testified at her § 341 meeting that the sales proceeds were used to pay down the mortgage.

By deed dated May 5, 1995, Yawl Lane Trust transferred the Florida property into the Debtor's name alone.[6] On that same day, the Debtor signed a "Declaration of Homestead," which was recorded with the clerk of the Superior Court of Sarasota County. In the declaration she stated she owned the Florida property and occupied it as her "residence and homestead." Also on May 5, 1995 the Debtor signed a "Declaration of Homestead" covering property at 531 Concord Street, Sudbury, Massachusetts (the "Sudbury property"). In this declaration she said she owned and occupied the Sudbury property as her "residence and homestead." The Debtor and Eugene had purchased the Sudbury property in 1979, taking title jointly. On May 5, 1995, they transferred the Sudbury property into the name of the Debtor alone for a stated consideration of One Dollar.

Shortly after these two declarations of homestead, Cadle brought suit in Massachusetts state court against the Debtor and Eugene on their guaranties. On June 14, 1995, the Massachusetts court enjoined them from conveying any property. In violation of this injunction, on July 5, 1995 the Debtor transferred Massachusetts real estate inherited from a relative to her brother for $100.

On August 2, 1996, the Debtor transferred the Sudbury property back to herself and Eugene as tenants by the entirety. On August 30, 1996, while Cadle's suit against them was pending, Eugene filed a voluntary chapter 7 petition with this court.[7]

On February 25, 1997, Cadle recovered a default judgment against the Debtor in the sum of $290,335, exclusive of interest and attorneys' fees. The present bankruptcy case followed shortly thereafter.

## II. DEBTOR'S FLORIDA RESIDENCY AND LITERAL COMPLIANCE WITH FLORIDA HOMESTEAD REQUIREMENTS

The Debtor supports her claim of Florida residency by affidavits asserting she has been a resident of Florida since April of 1995. Her declaration of a Massachusetts homestead on May 5, 1995 is in partial conflict with the affidavits. But Cadle offers nothing to contest the Debtor's residency since then. As the party with the burden of proof on the objection, Cadle has failed to sustain its burden on residency. Fed. R.Bankr.P. 4003(c), 7056. Indeed, Cadle does not contest the Debtor's Florida residency.

As is permitted by § 522(b) of the Bankruptcy Code, Florida has enacted legislation requiring its residents to claim their Florida rather than federal exemptions. Fla.Stat. § 222.20; 11 U.S.C. 522(b)(1) (1994). There is no question that by signing and recording her declaration of homestead the Debtor has literally complied with Florida statutory requirements. *See* Fla.Stat. § 222.01.

The Florida Constitution grants a homestead exemption in these words:

(a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person:

(1) a homestead, if located outside a municipality, to the extent of one hundred sixty acres of contiguous land and improvements thereon, which shall not be reduced without the owner's consent by reason of subsequent inclusion in a municipality; or if located within a municipality, to the extent of one-half acre of contiguous land, upon which the exemption shall be limited to the residence of the owner or his family[.]

Fla. Const. art. X, § 4(a)(1).

The Florida property, being located in the municipality of Sarasota, is limited to a one-

---

6. Pursuant to relief from stay granted in this case, Eugene's trustee in bankruptcy is seeking to recover his interest in the Florida property, contending that Eugene, through Yawl Lane Trust, fraudulently conveyed his interest to the Debtor.

7. Following relief from stay in Eugene's case, the bank holding a mortgage on the Sudbury property foreclosed the mortgage, leaving no surplus.

half acre homestead eligibility. Cadle does not contend it exceeds this acreage.

### III. INVALIDITY OF CLAIMED EXEMPTION BY REASON OF DEBTOR'S FRAUDULENT CONVERSION OF NONEXEMPT PROPERTY INTO EXEMPT PROPERTY

The Debtor's exemption claim is invalid, Cadle says, because her declaration of homestead was a fraudulent conversion of nonexempt property into exempt property, done with the intention of defrauding Cadle in the exercise of its rights as a creditor. Cadle points to the timing of the declaration, shortly after Cadle made demand for payment, and to the inconsistency in the Debtor's simultaneous declarations of both Florida and Massachusetts homesteads. It also urges that the Florida declaration be viewed in the context of a whole course of conduct designed to defraud Cadle. A fact finder certainly could find that the Debtor executed the declaration with fraudulent intent and that the entire course of her conduct reeks of fraud. But exemptions by their very nature frustrate creditors. Can prebankruptcy conversion of nonexempt property into exempt property be labeled fraudulent and hence destroy the exemption? The answer to this question implicates both the Bankruptcy Code and Florida law.

### A. Fraudulent Conversion Under Bankruptcy Code

Section 522, the Code's section on exemptions, says nothing about fraudulent conversion of nonexempt assets to exempt assets. The House report states:

As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. See Hearings, pt. 3, at 1355–58. The practice is not fraudulent as to creditors, and permits the debtor to make full use of the exemptions to which he is entitled under the law.

H.R.Rep. No. 95–595, 95th Cong. 2nd Sess. at 361, 1978 U.S.Code Cong. & Admin.News pp. 5963, 6316.

The later Senate Report parrots the same statements, minus only the reference to the House hearings. S.Rep. No. 95–989, 95th Cong. 2nd Sess. 76, 1978 U.S.Code Cong. & Admin.News pp. 5787, 5861–5862.

These comments in the committee reports do not bar Cadle's objection. The hearings referred to in the House report consist primarily of a letter written to Representative Edwards by Judge Aaron K. Phelps, a California bankruptcy judge. In the letter Judge Phelps states that "most of what is done in the name of 'prebankruptcy planning' borders on outright fraud, as far as I am concerned." Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Comm. of the Judiciary, 94th Cong., 1356 (1976). He observes that in the Ninth Circuit "conversion of non-exempt assets into exempt assets on the eve of bankruptcy is not, standing alone, fraudulent" and that "the law on this point is in a state of utter confusion in other circuits...." Id.

Consistent with Judge Phelp's comments, the leading authority under the Act had this to say about the state of the law on such conversion:

Generally the mere conversion of nonexempt property into exempt property on the eve of bankruptcy is not in itself such fraud as will deprive the bankrupt of his right to exemptions. But if it can be shown that there was fraudulent intent in the transaction, the exemption may be refused. The distinction is often a close one and depends entirely on the facts.

1A Collier on Bankruptcy ¶ 6.11 (14th ed.1978) [footnotes omitted]

The "current law" referred to in the committee reports was therefore case law which approved denying an exemption claim because of fraudulent intent in recent conversion of the property from nonexempt to exempt status. Decisions under the Code have so interpreted this legislative history, ruling it is not a bar to denial of discharge or exemption claims where fraudulent conversion has taken place. See, e.g., Ford v. Poston, 773 F.2d 52, 54–55 (4th Cir.1985); First Texas Sav. Ass'n v. Reed (In re Reed), 700 F.2d 986, 990 (5th Cir.1983) (also observing that "most courts" under the Act denied

exemption claims where conversion was effected with intent to defraud creditors). Florida bankruptcy courts have disagreed on the effect of § 522 and its legislative history upon the fraudulent conversion question. *Compare, e.g., In re Schwarb,* 150 B.R. 470 (Bankr.M.D.Fla.1992) (legislative history not indicative of congressional carte blanche on prebankruptcy planning) *with Crews v. First Colony Life Ins. Co. (In re Barker),* 168 B.R. 773 (Bankr.M.D.Fla.1994) (§ 522's silence requires allowance of exemption despite fraudulent conversion; denial of discharge is proper remedy).

Decisions under the Code have followed their Act cousins. Courts disallow an exemption or deny a debtor's discharge where the bankruptcy judge's finding of fraudulent intent in the conversion is not clearly erroneous. *E.g., Abbott Bank–Hemingford v. Armstrong (In re Armstrong),* 931 F.2d 1233, 1238–39 (8th Cir.1991) (purchase of exempt annuities—discharge denied); *Mueller v. Redmond (In re Mueller),* 867 F.2d 568 (10th Cir.1989) (purchase of exempt life insurance policy—denial of exemption claim affirmed); *Norwest Bank of Nebraska, N.A. v. Tveten,* 848 F.2d 871 (8th Cir.1988) (use of proceeds from sale of nonexempt property to purchase exempt insurance annuity contracts—discharge denied); *Ford,* 773 F.2d 52 (declaration of homestead after conveyance into joint names—discharge denied); *Reed,* 700 F.2d 986 (proceeds from sale of personal property applied to reduce mortgage on exempt residence—discharge denied). Conversely, applying the same principle of law, courts of appeal approve the exemption claim or grant of discharge when they believe the bankruptcy court's finding of no fraudulent intent in the conversion is not clearly erroneous. *Abbott Bank–Hemingford v. Armstrong (In re Armstrong),* 931 F.2d 1233, 1236–38 (8th Cir. ·1991) (use of nonexempt sale proceeds to purchase exempt annuities—allowance of exemption upheld); *Federal Sav. and Loan Ins. Corp. v. Holt (In re Holt),* 894 F.2d 1005 (8th Cir.1990) (use of nonexempt certificate of deposit to purchase exempt insurance policy—exemption allowed); *Hanson v. First Nat'l Bank in Brookings,* 848 F.2d 866 (8th Cir.1988) (use of proceeds from sale of nonexempt property to purchase exempt insur-

ance policies and pay down mortgage on exempt home—allowance of exemption upheld).

In basing their holdings on the clearly erroneous rule these decisions avoid establishing a standard to determine when conversion is fraudulent. They say conversion alone is not enough and they require "extrinsic evidence" of intent to defraud creditors. *E.g., Holt,* 894 F.2d at 1008; *Ford,* 773 F.2d at 54; *Reed,* 700 F.2d at 990. The nature of the required "extrinsic evidence" is vague. To some courts it can mean further conduct designed to mislead creditors. *E.g., Panuska v. Johnson (In re Johnson),* 880 F.2d 78, 82 (8th Cir.1989). To others, the proximity of the conversion to legal proceedings by a creditor is persuasive. *E.g., Bank Leumi Trust Co. of New York v. Lang,* 898 F.Supp. 883, 885 (S.D.Fla.1995).

■ There is another reason that the Code's legislative history does not defeat Cadle's objection. Where, as here, a state exemption is called into question, the validity of the conversion is determined by the law of that state. *E.g., Norwest Bank of Nebraska, N.A. v. Tveten,* 848 F.2d 871, 873–74 (8th Cir.1988). This means, in a case where state exemption law controls, that congressional intent on the fraudulent conversions question is irrelevant. If, on the other hand, a debtor's discharge is at issue, federal law controls. *Id.* In recognizing an exception for fraudulent conversion, however, both federal and state courts apply the same "standard." *In re Armstrong,* 931 F.2d at 1239 (8th Cir. 1991); *Tveten,* 848 F.2d at 874.

**B.** *Fraudulent Conversion Under Florida Law*

■ There is no decision of the Supreme Court of Florida on the consequences of a fraudulent declaration of homestead. In a recent decision, the Eleventh Circuit indicated its inclination to certify the question to that court should there be a finding below of fraudulent conversion. *In re Jost,* 136 F.3d 1455 (11th Cir.1998). I do not have that prerogative. Questions may be certified to the Supreme Court of Florida only by the Supreme Court of the United States or a

United States court of appeals. Fla.Stat. § 25.031 (1995); Fla.R.App.P. 9.150.

When they make a finding of fraud in the conversion, Florida bankruptcy courts deny exemption claims covering homesteads or other property. *In re Mackey,* 158 B.R. 509 (Bankr.M.D.Fla.1993) (use of proceeds from sale of nonexempt assets to purchase exempt annuity policies deemed fraudulent—exemption denied); *In re Coplan,* 156 B.R. 88 (Bankr.M.D.Fla.1993) (debtor's rejection of employment opportunities in Wisconsin, sale of Wisconsin home and use of proceeds to buy Florida home, all while being pursued by creditor, deemed fraudulent—homestead exemption allowed only in amount permitted by Wisconsin law); *In re Thomas,* 172 B.R. 673 (Bankr.M.D.Fla.1994) (use of proceeds from sale of nonexempt property to pay down home mortgage while in financial distress deemed fraudulent—homestead exemption denied to extent of payment). Florida bankruptcy courts have also rejected challenges to homestead claims if they find no fraud in the conversion. *E.g., In re Hill,* 163 B.R. 598 (Bankr.N.D.Fla.1994) (relocation to Florida days after entry of judgment deemed nonfraudulent fruition of retirement plans).

In 1993, while this case law was developing, the Florida legislature stepped into the fray, enacting § 222.30 of the Florida Statutes, which provides:

> Any conversion by a debtor of an asset that results in the proceeds of the asset becoming exempt by law from the claims of a creditor of the debtor is a fraudulent asset conversion as to the creditor, whether the creditor's claim to the asset arose before or after the conversion of the asset, if the debtor made the conversion with the intent to hinder, delay, or defraud the creditor.

Fla.Stat.Ann. § 222.30 (West 1998).

Maintaining that her constitutionally granted homestead exemption is sacrosanct, the Debtor cites *Bank Leumi Trust Compa-*

*ny of New York v. Lang,* 898 F.Supp. 883 (S.D.Fla.1995). The debtors in that case had guaranteed a bank loan to their corporation, which later failed. Shortly after the bank filed suit against them in New Jersey, they sold their New Jersey home for $940,000, purchased $500,000 of annuities, which were exempt under Florida law, and bought a new home in Florida for $522,000. Having obtained judgment in New Jersey, the bank sought postjudgment relief in Florida. Based largely on the timing of the conversion, the court found that the debtors intended to defraud the bank. It disallowed the exemption claim as to the annuities and authorized the bank to execute on these assets. But the court ruled otherwise as to the homestead claim. Relying upon *Butterworth v. Caggiano,* 605 So.2d 56 (Fla.1992), discussed later, the *Bank Leumi* court upheld the homestead exemption. Even though the fraudulent conversion doctrine is a judicial creation, the court was impressed by the absence of any exception for fraudulent conversion in the Florida constitution.[8]

Like the Eleventh Circuit in *Jost,* I do not believe that *Bank Leumi* settles the Florida homestead question. To the contrary, assuming fraud is found here after an evidentiary hearing, I conclude that on these facts the Supreme Court of Florida would approve denial of the Debtor's homestead exemption. I do so for several reasons.

In the first place, the court has already engrafted an exception upon the homestead provision in the Florida constitution. Where it would be inequitable, because of fraud or other reason, for funds to be retained, and the funds can be traced to expenditures on the home, the court has imposed an equitable lien on the property. For example, in *Palm Beach Sav. & Loan Ass'n v. Fishbein,* 619 So.2d 267 (Fla.1993), a husband had forged his wife's name on documents for a bank loan, whose proceeds were used to pay existing encumbrances on the marital home. When the bank later sought to foreclose its

---

**8.** *Bank Leumi's* holding on the homestead question has been influential in case law emanating from the Florida bankruptcy courts. Giving deference to *Bank Leumi,* many Florida bankruptcy courts have since upheld claims to a homestead exemption in fraudulent conversion cases. *See,*

*e.g., Barbee v. Statner (In re Statner),* 212 B.R. 164 (Bankr.S.D.Fla.1997); *In re Clements,* 194 B.R. 923 (Bankr.M.D.Fla.1996); *In re Popek,* 188 B.R. 701 (Bankr.S.D.Fla.1995); *Meininger v. Miller (In re Miller),* 188 B.R. 302 (Bankr.M.D.Fla. 1995).

mortgage, the wife claimed a homestead exemption senior to the mortgage. The court approved the imposition of an equitable lien for the benefit of the bank in the amount of the loan proceeds used to satisfy prior liens on the property. It did so to prevent unjust enrichment. Although recognizing that the wife had not participated in the fraud, the court stated: "[I]t is apparent that when equity demands it this Court has not hesitated to permit equitable liens to be imposed on homesteads beyond the literal language of article X, section 4." *Id.* at 270. *See also LaMar v. Lechlider*, 135 Fla. 703, 185 So. 833 (1939) (equitable lien imposed in favor of party residing on property who made improvements expecting to acquire interest in property); *Jones v. Carpenter* 90 Fla. 407, 106 So. 127 (1925) (equitable lien imposed in favor of victim of embezzlement in amount of embezzled funds used to improve property).

The Debtor relies, as did the *Leumi* court, upon *Butterworth v. Caggiano*, 605 So.2d 56 (Fla.1992). That case involved a homeowner who had been convicted of bookmaking. The state sought forfeiture of his residence on the ground it had been used in racketeering activity. Not surprisingly, the court ruled forfeiture violates the constitutional mandate against "forced sale under process of any court...." Fla. Const. art. X, § 4(a)(1). It distinguished *Jones* and *LaMar* on the ground those cases involved circumstances "where proceeds from fraud or reprehensible conduct were used to invest in, purchase, or improve the homestead." *Butterworth*, 605 So.2d at 61, n. 5. It noted that no illicit proceeds were used to purchase, acquire or improve the property in question.

*Butterworth* is not an abandonment of the court's equitable lien doctrine. *Fishbein*, which came later, proves that. In *Butterworth* the court merely seems to have believed there was no compelling inequity in upholding the homestead claim before it.

The equities here strongly favor Cadle. Or, to use the language of the fraudulent conversion cases, there is compelling "extrinsic evidence" of fraudulent intent. The Debtor did more than convert property from nonexempt to exempt status. She did so after Cadle had demanded payment and immediately before it brought suit. And she could be found to have established her Florida residency for the sole purpose of preventing Cadle from levying on the Florida property. Unlike the circumstances in *Hill*, 163 B.R. 598, there is no suggestion that the Debtor became a Florida resident as part of her retirement. She was 47 in April of 1995.

Moreover, the Supreme Court of Florida could approve denial of the Debtor's exemption without fully embracing the fraudulent conversion doctrine. The assumed facts here permit many unfavorable inferences. She engaged in a number of artifices, many of them directly related to the Florida property. She mortgaged the Florida property to secure a nonexistent debt. She transferred the Florida property to a trust to place it beyond Cadle's reach. In violation of a court injunction, she transferred inherited Massachusetts real estate to her brother for $100. She approved the transfer of the Company's property in fraud of Cadle and in violation of its security agreement. She participated in the conduct of the Company's business by GDI, a controlled entity, in a further attempt to defraud Cadle.

Perhaps most important, because directly related to her declaration of a Florida homestead, the Debtor signed simultaneous declarations of homestead for both the Florida and Sudbury property in which she stated that each was her "residence and homestead." Obviously, one of those declarations is untrue. Even assuming the Florida declaration is correct, the Debtor's concurrent deceit as to the Sudbury property infects the Florida declaration. Indeed, a fact finder could find that the Debtor's many other stratagems infect that declaration. It is difficult to imagine the Supreme Court of Florida approving a homestead claim on this record of fraud.

The Florida constitution is not a stiff parchment frozen in time. The equitable lien doctrine indicates that. Current mores are reflected in the large body of case law denying exemption rights due to fraudulent conversion. This case law interprets provisions in statutes and constitutions which like the Florida constitution make no mention of fraudulent conversion. And with the 1993

statutory amendment, there is more than case law on the question in Florida. It seems likely the Supreme Court of Florida would be particularly influenced by this amendment and would view it as mainstream debtor-creditor law. The court would also likely recognize the undesirability of having different rules for real and personal property.