**In re Alberto V. MESA, Debtor.**

**Bankruptcy No. 98–26669–BKC–RBR.**

United States Bankruptcy Court,
S.D. Florida,
Broward Division.

April 14, 1999.

Peter H. Levitt, Adorno & Zeder, Miami, FL, for plaintiff.

Emmanuel Perez, Coral Gables, FL, for defendant.

## MEMORANDUM ORDER SUSTAINING OBJECTION TO HOMESTEAD EXEMPTION AND GRANTING EQUITABLE LIEN

RAYMOND B. RAY, Bankruptcy Judge.

This matter came before the Court for evidentiary hearing on March 2, 1999 upon the Objection of Travelers Indemnity Company ("Travelers") to Debtor's Claimed Homestead Exemption. The Court, having considered the testimony and observed the demeanor of the Debtor and the other witnesses, having reviewed the exhibits admitted into evidence, including a stipulation of facts filed by the parties in a related proceeding,[1] the Debtor's Voluntary Petition, Statement of Financial Affairs and Schedules and the memoranda of law submitted by the parties, and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

In June 1996, the Debtor, Alberto V. Mesa[2], and Keith S. McKay purchased a residence located at 2749 N.E. 28th Street in Fort Lauderdale, Florida (the "homestead" or the "home"). The Debtor scheduled his one-half interest in this home as exempt property under the homestead exemption provided in Article X, Section 4(a) of the Florida Constitution.

The Debtor and McKay acquired the home as tenants in common and resided together in the home, sharing living expenses. The Debtor testified that the home was purchased for $215,000.00, but that the present market value of the home is $250,000.00. Schedule D to the Voluntary Petition lists first and second mortgages held by NationsBank in the respective amounts of $157,000.00 and $67,649.55. The Debtor testified that the second mortgage was to secure a home improvement loan, but that the money was actually used to finance a new business started by McKay after he lost his job with Travelers. Assuming the Debtor's estimate of present fair market value to be correct, and that the mortgage loans have not been paid down, there is approximately $25,000.00 of equity in the home.[3]

At the time the Debtor and McKay purchased the home, McKay was a claims adjuster for Travelers. Upon acquiring the home, the Debtor and McKay commenced an extensive home renovation project. New electrical work, plumbing, and air conditioning were installed throughout the house. Three bathrooms were completely remodeled and new fixtures were installed. The kitchen and garage were completely remodeled, all of the windows and flooring were replaced, and an addition to the master bedroom was built. In the Debtor's words, "It was redone almost completely."

To fund the project, McKay fraudulently caused checks, payable by Travelers, to be issue to the Debtor (17 checks totaling $147,977.70), the Debtor's mother, Rogelia Tarifa, (4 checks totaling $35,528.15) and

---

1. As incorporated in a Pretrial order, dated February 9, 1999 (the "Pre–Trial Order"), in Adv. No. 98–2433–BKC–RBR–A, in which Travelers is seeking non-discharge of the Debtor's debt to Travelers.

2. The Debtor is also known as Alberto Mesa Valero and Alberto Valero Mesa.

3. However, based on the purchase price of $215,000.00 and the amounts invested in renovating the home, as discussed below, it is possible that the present market value exceeds the $250,000.00 amount estimated by the Debtor. The parties did not introduce any appraisals or other independent evidence of the value of the home as improved.

to construction contractors and suppliers (checks totaling $194,909.76).

The Debtor testified that these amounts were used to pay for the home remodeling project, and that he was told by McKay that the checks were drawn on McKay's retirement account. At the time most of the checks were issued, McKay was approximately 32 years. The checks do not contain any reference to a retirement, pension or 401–K account. However, the Debtor testified that he saw only two of the checks, which he claims he did not read. McKay was prosecuted and ultimately plead guilty to grand larceny. He is serving a 30–month sentence.

The Debtor testified that all of the checks payable to him, totaling $147,-977.70, were used to pay for home improvements or as compensation for his services in connection with the home improvements. He admitted endorsing two of the checks payable to him, but testified that he did not know about the other fifteen checks until after McKay's fraudulent scheme was brought to light. The Debtor testified that McKay handled all of his banking and that the checks were deposited into their joint checking account at NationsBank, and that McKay received the monthly statements for this joint account. However, the Court notes that it appears from the canceled checks that they were deposited into the Debtor's account at Savings of America, which was not a joint account with McKay. The Debtor's explanation that he did not see his own bank statements is not credible.

The Debtor's testimony concerning the two checks he admitted endorsing is not credible. He testified that the two checks, which are in the amounts of $8,946.00 and $9,123.45.00, were in partial repayment of a $20,000.00 down payment for the purchase of the home and in payment for his hourly charges as a contractor. The Debtor, who is a draftsman by trade, explained that he prepared drawings and consulted in the renovation of the home and that McKay paid him for these services. He did not have a written contract with McKay.

Based on the information contained in the Debtor's Schedules, it is evident that the Debtor did not report these two checks as income for 1996. Further, the check in the amount of $8,946 is dated April 2, 1996, more than two months before the purchase of the home. The date of this check cannot be squared with the Debtor's testimony that a portion of this check served the dual purpose of partially repaying the Debtor's down payment on the home and paying the Debtor for his drafting and consulting services. Finally, the Debtor is not familiar with and never resided at the addresses which are clearly displayed under his name on the two checks he admittedly endorsed. When questioned about this, the Debtor explained that he did not read the checks. In view of the amounts of the checks (which together total more than two-thirds of the Debtor's other gross income for 1996), the Court does not accept the Debtor's explanation.

Nor does the Court accept the Debtor's testimony that he had no knowledge of the other fifteen fraudulent checks. Most of the checks payable to the Debtor were deposited into his own account at Savings of America. In addition, the Debtor admitted that he filled out withdrawal slips and personally withdrew the monies obtained from Travelers which were deposited into his mother's account. This testimony directly contradicts the Debtor's prior testimony at his Rule 2004 examination that he did not know about the use of his mother's account until after McKay was charged.

The Debtor testified that the monies he withdrew from his mother's account were used for the remodeling project, but he could not explain why several of the withdrawal slips are dated prior to the date when the home was purchased. Further, the Debtor could not explain why the supposed retirement account checks from McKay's account were deposited into the

Debtor's mother's account and then withdrawn to pay for home improvements. The Debtor's mother, a woman in her eighties, had no involvement in the purchase of the home or the remodeling project.

The Debtor testified that he did not have any idea how much the renovation project was costing and, therefore, had no reason to question McKay's alleged statement that the funds were drawn on his retirement account. However, the Debtor is employed as a draftsman for an engineering firm. He testified that he drew plans for the renovations and consulted on the project. Further, he was the co-owner of the home and lived in the home during the entire period of the renovations, which took about a year. In view of these facts, the Debtor's statement that he had no idea how much the job was costing is not credible. While he may not have known the exact cost, he certainly knew enough to question McKay's alleged explanation concerning the retirement account.[4]

Based upon the overall facts and circumstances, and in view of the many contradictions and gaps in the Debtor's explanation for what transpired, and also in consideration of the Debtor's demeanor on the witness stand, the Court disbelieves the Debtor's testimony that he lacked knowledge of the fraudulent diversion of Travelers' funds. The Court finds that the Debtor knew that some or all of the funds were obtained fraudulently by McKay. The Court further finds that the Debtor knowingly assisted and participated in the fraud by accepting payments made to him, by assisting in the use of his mother's account, and by actively participating in the use of the fraudulently obtained funds to pay for the home renovations and improvements.

In addition, the Court also notes that in his sworn statement dated February 24, 1997, McKay stated the following: "With the exception of Alberto Mesa Valero none of the recipients of these embezzled checks were aware of the checks being generated by me illegally." McKay identified this statement as his own when questioned about the statement in a videotaped deposition which was played at the hearing. Although McKay explained that his statement regarding the Debtor's knowledge was "taken out of context" and that he was under duress when he made the statement, McKay did not deny signing the statement and initialing each page. Nor did he explain how the statement was taken out of context or how the circumstances surrounding the giving of his statement gave rise to duress. Therefore, the Court considers McKay's sworn statement as additional evidence of the Debtor's knowledge that the checks were obtained illegally. While the sworn statement adds to the weight of the evidence supporting the Court's finding, the Court would make the same finding without the sworn statement.

## CONCLUSIONS OF LAW

■ The Debtor seeks an exemption for his one-half interest in the home in reliance upon Article X, Section 4(a) of the Florida Constitution which provides an exemption for homestead property.[5] Travelers objects to the homestead exemption on two grounds: (1) that the Debtor knowingly assisted McKay in fraudulently obtaining funds from Travelers and using such funds to pay for improvements to the homestead; and (2) that the Debtor would

---

4. McKay's testimony was presented by videotape deposition. He testified that he advised the Debtor that the funds were drawn on McKay's "money market" account. He did not mention the concept of a retirement account.

5. 11 U.S.C. § 522(b)(2)(A) provides that a debtor may exempt property which is exempt under state law. 11 U.S.C. § 522(b)(2)(B) provides that a debtor may exempt "an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law." Thus, but for the objection interposed by Travelers, the Debtor's interest in his homestead would be exempt.

be unjustly enriched at the expense of Travelers should the Court not impose an equitable lien on the home.

Travelers contends that this case is controlled by *Palm Beach Sav. and Loan Ass'n v. Fishbein*, 619 So.2d 267 (Fla. 1993), in which a husband forged his wife's signature on loan documents in refinancing the mortgage on their home. The wife did not know about the loan and was innocent of her husband's forgery. However, she was a co-obligor on the prior mortgage loan which was satisfied with the proceeds of the fraudulently obtained loan. *Id.* at 268. The bank was granted an equitable lien against the homestead to prevent the wife from receiving a windfall. The lien was for the amount of the bank's funds which were used to pay off the existing mortgage and taxes. *Id.* at 269.

*Fishbein* may or may not be limited to the narrow circumstances in which one creditor steps into the shoes of a predecessor which could have availed itself of an exception to the homestead exemption. *See Bank Leumi Trust Co. of New York v. Lang*, 898 F.Supp. 883, 888 (S.D.Fla.1995). However, the outcome of this case does not turn on the holding of *Fishbein* as the Court has found, based on substantial evidence, that the Debtor was not innocent of wrongdoing, but knowingly assisted in and benefitted from the fraudulent scheme. Under the facts presented, there is ample authority for the imposition of an equitable lien in favor of Travelers.[6]

■ Article X, section 4(a) of the Florida Constitution provides in pertinent part:
(a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person: (1) a homestead....

This provision grants an exemption from forced sale of a homestead subject to certain stated exceptions. The homestead exemption, however, is subject to equitable liens "beyond the literal language of article X, section 4," *Fishbein*, 619 So.2d at 270.

■ In *Jones v. Carpenter*, 90 Fla. 407, 106 So. 127 (1925), the Supreme Court of Florida established the principle that a homestead exemption "cannot be employed as a shield and defense after fraudulently imposing on others." *Id.* at 130. In *Jones*, the defendant, the president of an insolvent corporation, tortiously converted corporate funds to pay for labor and improvements to a recently acquired home. The creditors of the corporation elected a bankruptcy trustee who filed an action against the defendant to impose a lien on the homestead. The defendant asserted the homestead exemption as a defense. The Florida Supreme Court concluded that it could not let the defendant enjoy "tortuously acquired property" and granted an equitable lien in favor of the corporation's creditors. *Id.*

The rule stated in *Jones* that a homestead cannot be employed as an instrumentality of fraud has been restated in numerous Florida cases. *See, e.g., Hillsborough Inv. Co. v. Wilcox*, 152 Fla. 889, 13 So.2d 448, 450 (1943); *Gepfrich v. Gepfrich*, 582 So.2d 743, 744 (Fla. 4th DCA 1991); *Isaacson v. Isaacson*, 504 So.2d 1309, 1310 (Fla. 1st DCA 1987); *Ryskind v. Robinson*, 302 So.2d 427, 428 (Fla. 4th DCA 1974); *Clutter Const. Corp. v. Clutter*, 173 So.2d 761, 761–62 (Fla. 3d DCA 1965). It has been relied on in bankruptcy cases to disallow a homestead exemption or to impose a lien on homestead property. *See In re Grocki*, 147 B.R. 274, 278 (Bankr.

---

6. Travelers requests disallowance of the homestead exemption or, in the alternative, the imposition of an equitable lien. Based on the case law discussed herein, the Court concludes that the imposition of an equitable lien is the appropriate remedy under these circumstances.

S.D.Fla.1992) (imposing equitable lien on homestead where debtor used fraudulently obtained funds to pay down a mortgage); *In re Gherman,* 101 B.R. 369, 370 (Bankr. S.D.Fla.1989) (sustaining objection to homestead exemption where debtor used fraudulently converted funds to purchase a homestead).

The Florida Supreme Court has not retreated from *Jones.* In *Tramel v. Stewart,* 697 So.2d 821 (Fla.1997), the Court considered whether homestead property is forfeitable under the Florida Contraband Forfeiture Act (the "Forfeiture Act"). In *Tramel,* the homeowners used their property for a sophisticated marijuana growing operation and were engaged in selling marijuana. The homeowners sought to rely on the homestead exemption to prevent forfeiture of their home under the Forfeiture Act. Relying on the case of *Butterworth v. Caggiano,* 605 So.2d 56 (Fla.1992), wherein the Florida Supreme Court held that Article X, Section 4(a) of the Florida Constitution prohibits civil or criminal forfeiture of homestead property used in the course of racketeering activity in violation of Florida's Racketeer Influenced and Corrupt Act (Florida RICO Act), the Florida Supreme Court declined to recognize an exception to Article X, Section 4(a) based on the use of a homestead as an instrumentality to commit criminal activity. *Tramel,* 697 So.2d at 823. It stated that this was a task for the Constitutional Revision Commission. *Id.*

Neither *Tramel v. Stewart* nor *Butterworth v. Caggiano* involve efforts by creditors to recover fraudulently obtained or stolen funds which were used to purchase or improve homestead property. Rather, they involve the completely separate issue of whether a homestead may be forfeited to the state based on the criminal activity of the homeowner which may be unrelated to the acquisition or improvement of the homestead. The Florida Supreme Court gave no hint in *Tramel v. Stewart* or *Butterworth v. Caggiano* that it was reconsidering or retreating from *Jones v. Carpenter.*

The homestead exemption has also been at issue in several recent decisions involving fraudulent transfers or the fraudulent conversion of exempt into non-exempt assets. However, these decisions do not conflict with *Jones v. Carpenter.*

In *Bank Leumi Trust Co. of New York v. Lang,* 898 F.Supp. 883 (S.D.Fla.1995), the debtors fraudulently converted non-exempt property to exempt property. *Id.* at 885. After Bank Leumi filed suit in New Jersey to recover a $1.8 million loan guarantied by the Langs, the Langs sold their New Jersey home and used the proceeds to purchase a Florida home and annuities. Bank Leumi obtained a judgment against the Langs, domesticated the judgment in Florida, and sought enforcement against both the Florida home and the annuities. The District Court concluded that the Langs fraudulently converted non-exempt into exempt assets. Nevertheless, the District Court found that their Florida homestead was exempt. *Id.* at 887. The District Court relied on the Florida Supreme Court's decision in *Butterworth v. Caggiano,* 605 So.2d 56 (Fla. 1992).

In *In re Lane,* 190 B.R. 125 (Bankr. S.D.Fla.1995), a bankruptcy trustee commenced an adversary proceeding for turnover of homestead property, alleging that the debtor had fraudulently transferred settlement proceeds. *Id.* at 126. This Court concluded, in light of *Lang,* that the homestead exemption cannot be disallowed solely on the basis that the debtor committed a fraudulent transfer. *Id.* at 128. This Court distinguished the case from *Fishbein* noting that "neither the Trustee nor Brinks argue[d] that the funds used by the Debtor to purchase the 20th Way Property were fraudulently procured. Nor [did] they argue that their rights should be abrogated to the rights of another creditor." *Id.*

In this case, Travelers makes the argument that was not made in *Lane.* The

funds at issue in this case were stolen from Travelers and invested in improvements to the Debtor's homestead. This case does not involve the mere conversion of a debtor's non-exempt assets into exempt assets.[7] *See also In re Popek,* 188 B.R. 701, 703 (Bankr.S.D.Fla.1995) (denying objection to homestead exemption where creditor did not allege that debtor purchased homestead with fraudulently obtained funds "traceable to the objecting creditor").

In *Key Bank of Maine v. Jost,* 136 F.3d 1455 (11th Cir.1998), the Eleventh Circuit was presented with the issue of whether a homestead exemption can be disallowed if the purchase of the home or prepayment of a mortgage involves the fraudulent conversion of non-exempt to exempt assets. The Eleventh Circuit did not decide the issue because it concluded that the Bankruptcy Court had not made a finding that the debtor had purchased the home or prepaid the mortgage with intent to hinder, delay or defraud a creditor. *Id.* at 1459. The Eleventh Circuit vacated the district court's decision and remanded the case to the district court with instructions for it to remand the case to the bankruptcy court.[8]

The *Lane, Lang* and *Jost* trilogy of cases do not control the outcome in this case, as this case involves the investment of fraudulently obtained funds into a homestead, not merely the use of a homestead to hinder, delay or defraud creditors or the conversion of non-exempt to exempt assets. Thus, this case can be decided squarely within the holding of *Jones v. Carpenter* which remains the law in Florida.

■ As an additional argument, Travelers relies on the exception in Article X,

Section 4(a) of the Florida Constitution for "obligations contracted for the purchase, improvement or repair" of a homestead. McKay and the Debtor contracted with various construction contractors and suppliers to improve the homestead. These creditors were paid at least $194,909.76 with funds which were fraudulently obtained from Travelers. Therefore, Travelers argues, it should be equitably subrogated to the position of the contractors and suppliers, and should be granted an equitable lien for this amount. The Court agrees, based on *Fishbein.* However, in view of the Court's conclusion, based on *Jones v. Carpenter,* that Travelers is entitled to an equitable lien for the total amount invested in the home remodeling project, it is not necessary to impose an equitable lien for a lesser amount based on a subrogation theory.

### CONCLUSION AND ORDER

The Debtor knew about and assisted in the fraudulent obtaining of funds from Travelers. The imposition of an equitable lien in favor of Travelers is necessary to prevent the Debtor from using the homestead exemption as an instrument of fraud and to prevent the Debtor's unjust enrichment at Travelers' expense. An equitable lien may provide a means for Travelers to recover at least a portion of the funds which were misappropriated.

The amount of the equitable lien must be based on the amount of funds obtained from Travelers which were invested in the remodeling of the home and related expenses. Checks totaling $194,909.76 were paid to various contractors and suppliers involved in the home remodeling project. The Debtor testified that the amounts deposited in and withdrawn from his moth-

---

7. In *Lang* and *Lane,* the debtors, at least, owned the funds which were transferred, although the funds may have been assets which should have remained non-exempt in order to be available to satisfy the claims of creditors. This case involves an effort to shield stolen funds in a homestead.

8. The Eleventh Circuit, in *Jost,* hinted that it did not necessarily agree with the result in *Lang.* The Eleventh Circuit made clear that, if the issue in *Lang* had been presented on a complete factual record, it would have certified the issue to the Florida Supreme court as an undecided issue of great public importance. *Id.* at 1458.

er's account (totaling $35,528.15) also were used for the remodeling project. The Debtor also testified that the seventeen checks payable to him (totaling $147,-977.70) were used to pay for expenses associated with the home remodeling project, except, perhaps, for portions of two checks which the Debtor claims to have received in partial repayment of his down payment on the purchase of the home.

The total of these amounts, $378,415.61, dwarfs the present equity in the house, which, according to the Debtor's testimony, may not be more than $25,000. Nevertheless, the Court will impose an equitable lien for the full amount of $378,415.61. If, contrary to the Debtor's testimony, a smaller amount was invested in the home improvements, there is no prejudice to the Debtor since the total amount paid to contractors and suppliers alone far exceeds the probable equity in the home.

Based on the foregoing, it is hereby

**ORDER AND ADJUDGED** as follows:

1. Travelers' objection to homestead exemption is sustained.

2. Travelers is granted an equitable lien in the amount of $378,415.61 which shall bear interest at the Federal rate of interest applicable to Federal judgments.

3. The Debtor's homestead exemption shall not be a defense to any action by Travelers to enforce its equitable lien by foreclosure or otherwise.

**DONE AND ORDERED.**