In re: **FINANCIAL FEDERATED TITLE AND TRUST, INC. d.b.a. Viatical Federated Title and Trust, a.k.a. Asset Security Corp., a.k.a. Viatical Asset Recovery Corp., a.k.a. Quad B Ltd., Debtor.**

In re: **Financial Federated Title & Trust, Inc., a/k/a Asset Security Corp., a/k/a Viatical Asset Recovery Corp., a/k/a Quad-B-Ltd., a/k/a American Benefits Services, Inc., Debtor.**

**Raphael Levy, a.k.a. Ray Levy, Roseann M. Levy, Plaintiffs–Appellants,**

v.

**John W. Kozyak, Trustee, Defendant–Appellee.**

**No. 02–13839.**

United States Court of Appeals, Eleventh Circuit.

Oct. 3, 2003.

Susan N. Hayes, J.C. DeBoard & Co., L.P.A., Worthington, OH, for Plaintiffs–Appellants.

David L. Rosendorf, Kozyak, Tropin & Throckmorton, P.A., Miami, FL, for Defendant–Appellee.

Index System.

Before HULL, MARCUS and STAHL [*], Circuit Judges.

PER CURIAM:

On November 16, 2001, the United States Bankruptcy Court for the Southern District of Florida entered an order granting summary judgment in favor of Appellee. *In re Financial Federated Title & Trust, Inc.*, 273 B.R. 706 (Bkrtcy.S.D.Fla. 2001). The order imposed an equitable lien and constructive trust against Appellants' Florida homestead property. Appellants appealed to the United States District Court for the Southern District of Florida, which affirmed the Bankruptcy Court's order.

After review and oral argument, we conclude that Appellants purchased their home with fraudulently obtained funds and that the Florida Constitution does not protect Appellants' homestead property from an equitable lien or constructive trust for the reasons outlined in the Bankruptcy Court's thorough and well-reasoned order. Because the Bankruptcy Court's order amply describes the issues and controlling law in this case, we hereby adopt the Bankruptcy Court's order, attached hereto as Exhibit A.

AFFIRMED.

EXHIBIT A

John W. Kozyak, Chapter 11 Trustee, Plaintiff,

v.

Raphael Levy a/k/a Ray Levy, and Roseann M. Levy, Defendants.

Case No. 99–26616–BKC–RBR.

ADV. No. 00–2465–BKC–RBR–A.

United States Bankruptcy Court

Southern District of Florida

Broward Division

Nov. 15, 2001.

*MEMORANDUM OPINION AND ORDER GRANTING JOHN W. KOZYAK, PLAN ADMINISTRATOR'S MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF COMPLAINT*

RAYMOND B. RAY, Bankruptcy Judge:

This matter came on before the Court on October 10, 2001, upon the Plaintiff, John W. Kozyak ("Kozyak"), as the Plan Administrator for the confirmed Chapter 11 Plan of Financial Federated Title & Trust, Inc. ("FinFed"), American Benefits Services, Inc. ("ABS") and their various alter egos (collectively with FinFed and ABS the "Debtor"), *Motion for Summary Judgment on All Counts of Complaint* (the "Summary Judgment Motion") against Defendants Raphael Levy a/k/a Ray Levy ("Ray Levy") and Roseann M. Levy ("Roseann Levy") (collectively, the "Defendants"). The Court having reviewed the *Summary Judgment Motion* and all exhibits attached thereto, and all affidavits in support thereof as more fully described herein, as well as Ray Levy's *Memorandum in Opposition to John W. Kozyak, Plan Administrator's Motion for Summary Judgment on All Counts of Complaint* (the "Ray Levy Response") (C.P. # 72) with supporting affidavits and Roseann Levy's *Opposition In (sic) Motion For Summary Judgment* (the "Roseann Levy Response") (C.P. # 73), the entire court file in these proceedings, having considered the argument of counsel and being

[*] Honorable Norman H. Stahl, United States Circuit Judge for the First Circuit, sitting by designation.

otherwise fully advised in the premises, makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

### Procedural Background

On or about October 5, 1999 (the "Petition Date") an involuntary petition under Chapter 11 of the Bankruptcy Code was filed against ABS.

On or about October 7, 1999 an involuntary petition under Chapter 11 of the Bankruptcy Code was filed against Fin-Fed.

On or about December 27, 1999 this Court entered its *Default Final Judgment* in adversary number 99–2428–BKC–RBR–A styled *Kozyak v. Asset Security Corp.* which, among other things, found Asset Security Corp. ("ASC") to be the alter ego of FinFed.

The Bankruptcy Court entered an *Order for Relief* on or about November 16, 1999 adjudicating FinFed a Chapter 11 Debtor and on or about March 2, 2000 adjudicating ABS a Chapter 11 Debtor.

FinFed and ABS were substantively consolidated pursuant to this Court's *Order Granting Substantive Consolidation of Debtor with American Benefit Services, Inc.* ("ABS") dated May 17, 2000.

The Office of the United States Trustee appointed Kozyak as Trustee of FinFed on or about October 28, 1999 and the Court approved his appointment on or about November 5, 1999. By virtue of the substan-

tive consolidation, Kozyak serves as the Chapter 11 Trustee for ABS.

On June 20, 2001 the Bankruptcy Court entered its *Order Confirming Debtor's Amended Chapter 11 Plan* (the "*Confirmation Order*") in the Debtor's main case. The *Confirmation Order* provides that Kozyak shall serve as the Debtor's Plan Administrator after the Effective Date and appoints Kozyak as the Plan Administrator as of the Effective Date.

### The FinFed Ponzi Scheme

From its inception through the Petition Date, FinFed and its various alter egos, by and through a vast network of companies, insurance agents and financial consultants engaged in the business of soliciting money from investors for the purported purpose of purchasing investments known as viatical settlements.[1] However, the solicitation from investors was part of an elaborate Ponzi scheme to defraud, whereby investors were paid solely from funds received from other investors and not from the proceeds of viatical settlements while the principals diverted large portions of the proceeds to various other assets and individuals having nothing to do with viatical investments.

As part of the elaborate scheme, FinFed raised money from investors through various brokerage services, including but not limited to brokers employed by ABS.

Frederick Brandau ("Brandau") was the principal and person in control of FinFed.

Ray Levy was the president, sole shareholder and individual in control of ABS

---

1. A viatical settlement is an investment through which a terminally ill person (the "Viator") sells his life insurance policy and, when the Viator dies, the investor collects death benefits. The amount an investor pays for a viatical settlement is based on medical predictions of how long the Viator will sur-

vive, the premiums that must be paid, the length of time the investment will be non-producing and several similar variable factors. Accordingly, the return in a viatical investment is extremely unpredictable and risky.

and its participation in the investment scheme.

Ray Levy, directly and through ABS, solicited and obtained investor funds through a network of insurance agents and financial consultants.

On or about August 30, 1999 as a result of this FBI investigation, a grand jury returned a multi-count indictment in Southern District of Florida Case No. 99–8125–CR–Hurley against FinFed, its principal, Frederick Brandau and various other individuals and entities associated with FinFed (the "Criminal Case"). The Defendants were charged with, among other things, violations of Title 18, United States Code, Sections 1956 and 1957, involving fraud and conspiracy. The indictment alleged that the defendants fraudulently obtained investor funds exceeding $115,000,000 through the sales of investments in viatical settlement policies. On May 26, 2000, a *Second Superceding Indictment* was issued in the Criminal Case, naming additional defendants, including ABS and its principal, Ray Levy, charging these additional defendants with mail fraud, money laundering, and conspiracy to commit both mail fraud and money laundering. On December 14, 2000 a *Third Superceding Indictment* was issued in the criminal case. Kozyak pled guilty on behalf of FinFed and ASC on May 30, 2000, and judgment of conviction was entered against FinFed and ASC on August 18, 2000.

On August 29, 2000, a jury found Brandau guilty of 43 of the 44 counts asserted against him in the *First Superceding Indictment.* On January 4, 2001, Brandau was adjudicated guilty and sentenced to fifty-five (55) years in prison.

On March 28, 2001 Ray Levy pled guilty to one count of conspiracy to commit mail fraud and one count of conspiracy to commit money laundering (Counts One (1) and Fifteen (15) of the *Third Superceding Indictment).*[2] He was adjudicated guilty and is awaiting sentencing.

On March 29, 2001 Kozyak pled guilty on behalf of ABS to various counts arising in the Criminal Case. ABS was adjudicated guilty and sentenced on June 15, 2001.

The remaining defendants in the Criminal Case have either pled guilty, or have been convicted and are awaiting sentencing.

*First R&R Trust and U.S. Benefits*

In 1998 Levy formed an entity known as First R&R Trust ("First R&R"). It is undisputed that Levy was the person in control of First R&R as well as the person with the authority to use the funds of First R&R in the manner he saw fit. It is further undisputed that Levy formed First R&R in order to receive funds from the Debtor rather than Levy receiving such funds directly.

It is undisputed that in the four (4) years prior to the Petition Date, First R&R received a total of $7,797,952.19 which were funds raised by the Debtor in furtherance of the Ponzi scheme and fraudulently transferred from the Debtor to First R&R.[3]

---

**2.** A copy of the Ray Levy Plea Agreement was filed with this Court in connection with this proceeding and this Court has taken judicial notice of it pursuant to Fed.R.Civ.P. 201. See, *Register of Documents for Plaintiff John W. Kozyak's Motion for Court to Take Judicial Notice,* (C.P. # 54) Exhibit "B."

**3.** This Court has previously found that all funds transferred from the Debtor to First R&R were fraudulently transferred. See, *Memorandum Opinion and Order Granting John W. Kozyak, Trustee's Motion for Summary Judgment on All Counts of Complaint,* entered in *Kozyak v. First R&R,* Adv. No. 00–2204–BKC–RBR–A.

Sometime in 1996 Levy formed an entity known as U.S. Benefits Services Trust ("U.S. Benefits"). It is undisputed that Levy was the person in control of U.S. Benefits as well as the person with authority to use the funds at his discretion. U.S. Benefits received funds directly from the Debtor.

It is undisputed that in the four (4) years prior to the Petition Date, U.S. Benefits received a total of $4,311,184.99 which were funds raised by the Debtor in furtherance of the Ponzi scheme and fraudulently transferred from the Debtor to U.S. Benefits.[4]

*The El Caballo Property*

On or about September 17, 1998, the Defendants purchased real property located at 10540 El Caballo Court, Delray, Florida (the "El Caballo Property").

Jeff Paine ("Paine") was the attorney who closed the purchase on the El Caballo Property. On February 2, 2001, Paine pled guilty to conspiracy to commit mail fraud.

The funds to purchase the El Caballo Property all came from First R&R. The checks to purchase the El Caballo Property were made payable to Paine's Trust account.

The funds transferred from R&R to Paine for the purchase of the El Caballo Property totaled $1,150,000.00.

On September 17, 1998, the time of the purchase of the El Caballo Property, First R&R had a total of $1,309,521.00 in its account. Of this amount, it is undisputed that $977,521.00 are funds that can be traced directly back to the Debtor and

$227,000.00 are funds which can be traced directly back to U.S. Benefits.

Of the funds present in U.S. Benefits' account on the days of the transfers to First R&R, approximately 91% of such can be directly traced to the transfers the Debtor made to U.S. Benefits.

When purchased in 1998, the El Caballo Property was titled in First R&R's name. However, on August 26, 1999, just four days prior to the grand jury's handing down of the original indictment in the Criminal Case, two transactions took place. First, First R&R transferred by warranty deed the title to the El Caballo Property to Ray and Roseann Levy individually. Second, the Defendants obtained a mortgage with Washington Mutual Bank in the amount of $700,000.00 which was collateralized by the El Caballo Property and which drained more than half of the equity in the El Caballo Property. Thus, although the El Caballo Property was purchased with funds from First R&R, the property is now owned by the Defendants named herein.

It is undisputed that the Defendants both enjoyed the benefit of living in the El Caballo Property purchased with Debtor funds from at least September of 1998 until the house was sold in late 2000, as well as the benefit of a substantial portion, if not all, of the funds which Washington Mutual provided in return for the mortgage which was recorded against the El Caballo Property on August 26, 1999.

*The Adversary Proceeding*

On or about September 26, 2001, Kozyak filed an *Amended Complaint for Imposition of Equitable Lien and Constructive*

---

4. This Court has previously found that all funds transferred from the Debtor to U.S. Benefits were fraudulently transferred. See *Partial Final Judgment by Default Against U.S. Benefits Services Trust,* entered in *Kozyak v. Raphael Levy a/k/a "Ray" Levy, individually, et al.,* Adv. No. 99–2544–BKC–RBR–A.

*Trust* (the "*Complaint*") (C.P. # 5) in this adversary proceeding.

By and through the *Complaint,* Kozyak alleges that most if not all of the funds used to purchase the El Caballo Property can be traced directly back to the FinFed fraud and thus, seeks the imposition of an equitable lien or the establishment of a constructive trust against the El Caballo Property, which has a legal description of:

Lot 10 of TIERRA DEL REY SOUTH, according to the Plat thereof, as recorded in Plat Book 35, Page 64 of the Public Records of Palm Beach County, Florida.

Pursuant to the Court's December 7, 2000 *Order Granting in Part Emergency Motion for Relief from Injunction and Attachment and to Order Transfer of Real Estate,* the El Caballo Property was sold and the equity proceeds from the sale in the approximate amount of $525,635.94 (the "Sale Proceeds") were placed into a separate escrow account where they remain today pending final resolution of this proceeding.

The Defendants filed their *Answer to Trustee's Amended Complaint (the "Answer")* (C.P. # 32) on or about January 25, 2001.

### CONCLUSIONS OF LAW

#### A. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, incorporated by Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment is proper, "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and that the moving party is entitled to judgment as a matter law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.

P.56(c). In 1986, the Supreme Court decided a trilogy of cases which encourage the use of summary judgment as a means to dispose of factually unsupported claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Since the primary purpose of granting summary judgment is to avoid unnecessary trials when there is no genuine issue of material fact in dispute, if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505 (citation omitted).

Once a moving party identifies those portions of the record that demonstrate the absence of a general issue of material fact, any party opposing summary judgment must set forth specific facts showing a genuine issue for trial and may not rely on mere allegations or denials. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548, *Anderson,* 477 U.S. at 256–57, 106 S.Ct. 2505. If the record as a whole could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue of fact precluding summary judgment. *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348. Where the factual context renders the non-moving party's position implausible, it must come up with more persuasive evidence than would otherwise be necessary to defeat summary judgment. *Id.* at 587, 106 S.Ct. 1348.

The material issues of fact in this case are generally undisputed. In fact, for purposes of this *Summary Judgment Motion* the Defendants have conceded all facts

asserted by Kozyak to be true.[5] Accordingly, as all material facts are undisputed, summary judgment will be appropriate upon an analysis of the relevant law.

In this case, Kozyak seeks the imposition of an equitable lien against the proceeds of the El Caballo Property. The Defendants assert that the El Caballo Property is protected by Article X, Section 4 notwithstanding that most, if not all of funds used to purchase the El Caballo Property can be traced back to the FinFed fraud. Kozyak asserts that the line of cases allowing for the imposition of an equitable lien against homestead in certain circumstances are controlling. The Defendants contend that the equitable lien cases are not applicable, but rather the forfeiture cases are more applicable to prevent the imposition of an equitable lien and further, that the Supreme Court of Florida's recent decision in *Havoco of America. Ltd v. Hill,* 790 So.2d 1018 (Fla.2001) confirms this. A review of these decisions is therefore in order.

### B. The Homestead Exemption

Article X, Section 4(a) of the Florida Constitution provides in pertinent part:

(a) There shall be exempt from forced sale under process of any court, and no judgment, decree or execution shall be a

lien thereon, except for the payment of taxes and assessments thereon, obligations contracted for the purchase, improvement or repair thereof, or obligations contracted for house, field or other labor performed on the realty, the following property owned by a natural person: (1) a homestead . . . .

This provision grants an exemption from the forced sale of a homestead subject to these three exceptions.

The Supreme Court of Florida has long emphasized that the homestead exemption is to be liberally construed in the interest of protecting the family home. *See, e.g., Milton v. Milton,* 63 Fla. 533, 58 So. 718, 719 (Fla.1912) (*overruled in part* by *Pasco v. Harley,* 73 Fla. 819, 75 So. 30 (Fla. 1917)). However, the exemption is not to be so liberally construed as to make it an instrument of fraud or imposition upon creditors. *Milton,* 58 So. at 719.

### C. Equitable Liens

In *Jones v. Carpenter,* 90 Fla. 407, 106 So. 127 (Fla.1925) the Supreme Court of Florida, established the principle that the homestead "cannot be employed as a shield and defense after fraudulently imposing on others." *Id.* at 130. Jones, the trustee of a bankrupt bread company, sued Carpenter, the former president of the debtor, asserting a claim for an equitable

---

**5.** Even if the Defendants had not conceded these facts, the undisputed affidavits of John Kozyak and Soneet Kapila filed in support of the *Summary Judgment Motion* in conjunction with the conviction of Fred Brandau, and the guilty pleas of ABS and Ray Levy undisputably establish that this Debtor's operations were nothing more than a massive fraud and Ponzi scheme. The guilty pleas of ABS and Levy and the convictions of ABS, FinFed and Brandau, eliminates the need for Kozyak to prove the continuing fraud. See *Matter of Raiford,* 695 F.2d 521, 523 (11th Cir.1983); *In re Mark Benskin & Co.,* 161 B.R. 644 (Bankr.W.D.Tenn.1993); *In re Randy,* 189

B.R. 425 (Bankr.N.D.Ill.1995); *In re Rodriguez,* 209 B.R. 424 (Bankr.S.D.Tex.1997); and *In re Cannon,* 230 B.R. 546 (Bankr. W.D.Tenn.1999). (Concept of collateral estoppel applied to prevent relitigation of issues subsequently brought in a civil suit to the related issues determined in the criminal proceedings). Moreover, the Defendants do not dispute that the majority of funds used by First R&R to purchase the El Caballo Property are directly traceable to the FinFed fraud, nor do they dispute that they enjoyed the benefits of the use of the El Caballo Property as well as the $700,000 loan obtained with the equity in the El Caballo Property.

lien on Carpenter's homestead. Carpenter had caused the debtor company to pay for various improvements to his homestead, and the trustee Jones asserted that Jones the debtor was therefore entitled to an equitable lien on Carpenter's home. The Florida Supreme Court concluded that Jones' claims fell within the exception to the homestead exception and ruled that, Jones as trustee was entitled to an equitable lien on the property. In so doing, the Court said:

> Appellant [Jones], who steps into the shoes of the Bread Company, cannot follow said funds or materials into Carpenter's home and recover them, they having been so converted, but he can subject the home to the repayment or restoration of said funds.

*Jones,* 90 Fla. at 416, 106 So. at 130.

In denying the homestead exemption, the Court stated:

> Appellee in other words takes the position that as president of the Jacksonville Bread Company ... he can then fraudulently or surreptitiously extract from its assets the sum of $535.84 in cash and use the same to improve his home thereby contributing to the bankruptcy of the Bread Company to the detriment of innocent creditors and then claim immunity from re-paying the funds or assets so taken by virtue of his homestead exemption.
>
> Purely from a standpoint of commercial or business ethics it would be difficult to state a set of facts constituting more reprehensible conduct, and while this court has repeatedly held that organic and statutory provisions relating to homestead exemptions should be liberally construed in the interest of the family home, they should not be applied so as to make them an instrument of fraud or imposition upon creditors.

*Jones,* 90 Fla. at 414, 106 So. at 130 (citations omitted).

The rule stated in *Jones* that a homestead cannot be employed as an instrumentality of fraud has been restated by the Supreme Court of Florida in numerous cases to impose an equitable lien against homestead property. *See, Craven v. Hartley,* 102 Fla. 282, 135 So. 899 (Fla.1931); *LaMar v. Lechlider,* 135 Fla. 703, 185 So. 833 (Fla.1939); *Sonneman v. Tuszynski,* 139 Fla. 824, 191 So. 18 (Fla.1939).

In 1993, the Florida Supreme Court again emphasized its rule pronounced in *Jones,* in *Palm Beach Savings & Loan Association, F.S.A. v. Fishbein,* 619 So.2d 267 (Fla.1993). In *Fishbein,* the Florida Supreme Court allowed the imposition of an equitable lien against homestead property where the debtor obtained a loan and used the loan to satisfy three existing mortgages on the homestead property. Specifically, Mr. Fishbein obtained a loan for $1.2 million from a Palm Beach bank secured with a mortgage on the house he owned with his wife. Unbeknownst to the bank and Mrs. Fishbein, Mr. Fishbein forged his wife's name on the mortgage deed, and used approximately $930,000 from the proceeds of the loan to satisfy three existing mortgages and taxes on the property. Thereafter, Mr. Fishbein and his wife divorced. In the divorce proceedings, Mrs. Fishbein obtained the house under the apparent assumption that the house was owned free and clear. Subsequently, Mr. Fishbein defaulted on Palm Beach bank's loan and the bank instituted foreclosure proceedings. The Florida Supreme Court agreed with the trial court and ruled that although the bank could not foreclose on the fraudulently obtained mortgage, the bank was entitled to an equitable lien to the extent the funds fraudulently procured from the bank were used to satisfy existing mortgages and

therefore benefitted the home. The Supreme Court pronounced in *Fishbein* "Where equity demands it this Court has not hesitated to permit equitable liens to be imposed on homesteads beyond the literal language of Article X, Section 4." *Fishbein,* 619 So.2d at 270.

The United States District Court for the Southern District of Florida has also applied *Fishbein* and awarded a judgment creditor an equitable lien in a situation when judgment debtor satisfied a third party's mortgage with the proceeds of a fraudulent transfer. In *Babbit Electronics, Inc. v. Dynascan Corp.,* 915 F.Supp. 335 (S.D.Fla.1995) the plaintiff sought the award of an equitable lien against the homestead property of the judgment debtor's daughter and son-in-law. The court, finding that the transfer made to the mortgage company on behalf of the daughter and son-in-law was a fraudulent transfer, awarded an equitable lien to the judgment creditor in the amount of the transfer. In so doing, the court cited to *Fishbein* and specifically stated that the daughter and son-in-law "stand in no worse position by the imposition of an equitable lien than they stood before the fraudulent transfer of funds." *Babbit,* 915 F.Supp. at 338 (opinion of Garber, Magistrate Judge).

In *In re Mesa,* 232 B.R. 508, 512–513 (Bankr.S.D.Fla.1999) this Court applied the rule pronounced in *Jones* and its predecessors to impose an equitable lien against a debtor's homestead. In *Mesa,* the debtor fraudulently obtained funds from Travelers Indemnity Corp. ("Travelers") using the funds to pay for home improvements. The debtor then sought to exempt the home as his homestead. Travelers objected seeking the imposition of an equitable lien. Relying on *Jones,* this Court imposed an equitable lien against the debtor's homestead in the amount of

fraudulently transferred funds finding that the case involved the investment of fraudulently obtained funds directly into a homestead not merely the use of a homestead to hinder, delay or defraud creditors or the conversion of non-exempt assets. *Mesa,* 232 B.R. at 513.

The Florida Supreme Court, in its most recent opinion in *Havoco of America, Ltd. v. Hill,* 790 So.2d 1018 (Fla.2001) stated its continued approval of its rule pronounced in *Jones* specifically stating that the equitable lien as imposed in *Jones* was still a viable remedy for creditors in cases where funds obtained fraudulently were used to purchase, invest in or improve a homestead. Unlike *Jones, Fishbein, Mesa* and the other equitable lien cases, *Havoco* involved a debtor's conversion of nonexempt assets into a homestead with the specific intent to hinder, delay and defraud the debtor's creditors. The Florida Supreme Court, considering the issue on a certified question from the Court of Appeals for the Eleventh Circuit, held that Article X, Section 4 of the Florida Constitution did not prohibit such a conversion of assets, and upheld the debtor's assertion of his homestead exemption. However, the court specifically distinguished *Jones* and other cases which imposed equitable liens when the homesteads were purchased with the fruits of fraudulent activity:

> We have invoked equitable principles to reach beyond the literal language of the exceptions only where funds obtained through fraud or egregious conduct were used to *invest in, purchase or improve the homestead.*

*Havoco,* 790 So.2d at 1028 (emphasis added) (footnote omitted). Thus, the *Havoco* decision has upheld the equitable lien cases where the funds obtained through fraud or egregious conduct can be directly traced to the investment, purchase or improvement of homestead.

## D. The Forfeiture Cases

In *Tramel v. Stewart*, 697 So.2d 821 (Fla.1997), the Florida Supreme Court considered whether homestead property is forfeitable under the Florida Contraband Forfeiture Act. In *Tramel*, the homeowners used their property for a sophisticated marijuana growing operation and were engaged in selling marijuana. The homeowners sought to rely on the homestead exemption to prevent forfeiture of their homestead under the Forfeiture Act. Relying on the case of *Butterworth v. Caggiano*, 605 So.2d 56 (Fla.1992), wherein the Florida Supreme Court held that Article X, Section 4(a) of the Florida Constitution prohibits civil or criminal forfeiture of homestead property used in the course of racketeering activity in violation of Florida's Racketeer Influenced and Corrupt Act, the Florida Supreme Court declined to recognize an exception to Article X, Section 4(a) based on the use of a homestead as an instrument to commit criminal activity. *Tramel*, 697 So.2d at 823.

Neither *Tramel* nor *Butterworth* involve efforts by creditors to recover fraudulently obtained or stolen funds which were used to purchase or improve homestead property. Rather, they involve the completely separate issue of whether a homestead may be forfeited to the state based on the criminal activity of the homeowner which may be unrelated to the acquisition or the improvement of the homestead. As this Court has previously recognized, the Florida Supreme Court gave no hint in *Tramel* or *Butterworth* that it was reconsidering or retreating from its position in *Jones. Mesa*, 232 B.R. at 513.

In *Bank Leumi Trust Co. of New York v. Lang*, 898 F.Supp. 883 (S.D.Fla.1995), the debtors fraudulently converted non-exempt property to exempt property. After Bank Leumi filed suit to recover a $1.8 million loan guaranteed by the debtors the debtors sold their New Jersey home and used the proceeds to purchase a Florida home. Bank Leumi obtained a judgment against the debtors and sought to enforce the judgment against the Florida home. The district court concluded that the debtors had fraudulently converted non-exempt to exempt assets however, in relying on the *Butterworth* decision, concluded that the Florida homestead did not except property acquired for the sole purpose of hindering and defeating creditors' claims.

In *In re Lane*, 190 B.R. 125 (Bankr. S.D.Fla.1995) a bankruptcy trustee commenced an adversary proceeding for turnover of homestead property, alleging that the debtor had fraudulently transferred settlement proceeds. The trustee did not argue that the funds used to purchase the homestead were fraudulently procured. Thus, in light of *Bank Leumi*, the bankruptcy court concluded that the homestead exemption could not be disallowed solely on the basis that the debtor committed a fraudulent transfer.

In this case, the majority of funds obtained by First R&R were undisputedly obtained by fraud. Such a finding has already been made. First R&R then used those funds to purchase the El Caballo Property.

The Defendants argue however that *Tramel, Butterworth* and its successors are applicable to this situation to prevent the imposition of a lien against the homestead because the funds to purchase the El Caballo Property were not "embezzled" by Levy and therefore are only "related" to the criminal activity of FinFed. This argument however, simply ignores the fundamental issue that the funds to purchase the home came directly from the FinFed fraud. In fact, this argument would seem to infer that the El Caballo Property was not purchased with fraudulently obtained

funds but rather was simply used as a base from which the fraud was operated just as in *Tramel* and *Butterworth.* If the facts were so, the forfeiture cases would apply to prevent the imposition of an equitable lien. This is not the case however. Rather, the undisputed evidence clearly reflects that the El Caballo Property was purchased by First R&R with funds directly obtained from the FinFed fraud.

As an additional argument, the Defendants in this case assert that the *Tramel, Butterworth, Lane* and *Bank Leumi* cases are controlling because: (1) the funds that were transferred to First R&R were for commissions and therefore property of Ray Levy and (2) the fraudulent transfers to First R&R and U.S. Benefits cannot be used to obtain a lien against the homestead. The Defendants' argument however, is based on the presumption that First R&R and U.S. Benefits obtained their funds in exchange for providing some value to the Debtor and therefore Kozyak's efforts are more similar to an action under 11 U.S.C. § 550(a). This presumption is flawed. This Court has already found that First R&R and U.S. Benefits gave no consideration in exchange for funds fraudulently transferred to it by the Debtor. Thus, unlike in *Lane* and *Bank Leumi,* where the debtors did own the funds which were transferred, the Defendants in this case did not merely convert non-exempt assets which they owned to exempt but rather invested the fraudulently obtained funds directly into homestead.

### E. Roseann Levy

Roseann Levy asserts that her lack of knowledge or involvement in the Debtor's massive fraudulent activity exonerates her from liability and renders the holdings of *Jones* and *Fishbein* inapplicable to her. However, a lack of knowledge on the part of the person asserting the homestead exemption does not change this analysis, as it is the fraudulent nature of the funds which is of utmost importance. The undisputed facts show that the Defendants gave no consideration for the tainted funds used to purchase the El Caballo Property and have been unjustly enriched by the use of these funds. Unjust enrichment can be the basis for the assertion of an equitable lien. In *Fishbein,* the Florida Supreme Court imposed an equitable lien on homestead property based on an unjust enrichment and subrogation theory, notwithstanding the fact that Mrs. Fishbein had not participated in the fraud. The court also extended the equitable lien to the homestead interest of the uninvolved spouse in all three cases. In *Fishbein* the court specifically stated:

> Thus, it is apparent that where equity demands it this Court has not hesitated to permit equitable liens to be imposed on homesteads beyond the literal language of article X, section 4. However, the court below was not so concerned with the constitutional language as it was with the belief that an equitable lien could not be imposed because Mrs. Fishbein was not a party to the fraud. Yet, there was no fraud involved in either *La Mar* or *Sonneman.* In those cases, the equitable liens were imposed to prevent unjust enrichment. *Moreover, in both cases the homestead interest of the spouse of the party whose conduct led to the unjust enrichment was also subject to the equitable lien.*
>
> * * *
>
> Mrs. Fishbein is not entitled to a $930,000 windfall. The homestead exemption is intended to be used as a shield, not a sword.

*Id.* at 270–71 (emphasis added) (footnote omitted). *See also Spridgeon v. Spridgeon,* 779 So.2d 501 (Fla.App.2d Dist.2000)

(imposing equitable lien in favor of former husband on unjust enrichment theory when former husband supplied funds for purchase of condominium where court made no finding of fraud).

In *Babbit*, the funds transferred by the defendant to his daughter-in-law were subsequently used to satisfy a mortgage on a home the daughter-in-law and her husband were occupying. Since nearly $120,000.00 was used to satisfy a mortgage, the creditor was entitled to an equitable lien on their home in the amount of the transfer. The court reasoned that the transferees would stand in no worse of a position by the imposition of an equitable lien than they stood before the fraudulent transfers. *Babbit*, 915 F.Supp. at 338. Similarly, if this Court were to impose an equitable lien on the El Caballo Property, both Roseann Levy and Ray Levy would be in the same position as they were before the fraudulent transfers, making an equitable lien appropriate.

In the instant case the Defendants did not satisfy a mortgage with the funds; they outright purchased a home. This distinction, however, is immaterial to this Court's ability to impose an equitable lien, as the end result is the same. It is undisputed that the Defendants, through First R&R used fraudulently obtained funds to purchase the El Caballo Property, for which they gave no value to the Debtor. The Defendants have been unjustly enriched due to the use of the funds to purchase the El Caballo Property and then, after it was clear that the Debtor's scheme was collapsing, by taking out a mortgage for $700,000.00, more than half of the equity in the El Caballo Property.

### F. Imposition of a Constructive Trust

The doctrine of constructive trusts is a recognized tool of equity designed in certain situations to right a wrong committed and to prevent unjust enrichment of one

person at the expense of another either as a result of fraud, undue influence, abuse of confidence or mistake in the transaction. *In re Powe*, 75 B.R. 387, 393 (Bankr. M.D.Fla.1987). In *In re First Fidelity Fin. Serv., Inc.*, 36 B.R. 508 (Bankr. S.D.Fla.1983), the Bankruptcy Court held that:

> The reason for imposing a constructive trust is to avoid unjust enrichment to the recipient of the windfall, and to do equity for the party whose property has been misused. But a desire to do equity alone is not enough. The essence of the equitable remedy of imposing a constructive trust, as opposed to the legal remedy of damages, is the concept that the very property in question can be returned to its rightful owner. The law gradually broadened so that the proceeds of the original property may be pursued, but the basic requirement of tracing the original property, albeit in its various forms, remains an element of proof for constructive trusts.

*Id.* at 511 (citation omitted).

Before one can successfully impress a constructive trust, there must be an identifiable *res* on which the trust can be impressed. If the original *res* no longer remains, but is transformed into a different form, it is the burden of the party seeking to impress a constructive trust to trace the property to specific funds before it can prevail. *In re Powe*, 75 B.R. at 393. Traceable proceeds from prior fraudulent transfers, which are used to acquire a homestead, may also be subject to a constructive trust. *In re Lapes*, 254 B.R. 501 (S.D.Fla.2000).

Despite the Defendants' conversion of the fraudulently obtained funds into the El Caballo Property, Kozyak can nonetheless trace the amount he seeks in order to impose a constructive trust on this property.

In *In re Mart*, 106 B.R. 309 (Bankr. S.D.Fla.1989) Judge Britton had before him a creditor's attempt to impose a constructive trust upon homestead property. In analyzing the legal principles applicable to the case Judge Britton stated:

> I agree with Chicago Title that if it had proved that these properties were financed *to any significant extent* with money traceable to the funds embezzled by [the Debtor's brother] and if it had proved that [the Debtor] furnished no consideration for those funds ... a resulting trust would be appropriate.

*Id.* at 311 (emphasis added).

Although Judge Britton ultimately determined that the debtor in *Mart* proved that the funds to purchase the property came from an independent third source unrelated to the debtor or the debtor's brother, his statement regarding the tracing of the funds is applicable here. Kozyak can trace directly or indirectly over 90% of the funds used to purchase the El Caballo Property to the Debtor's fraud. Clearly, all but a fraction of the funds First R&R used to purchase the El Caballo Property originated with the Debtor. It is undisputed that the vast majority of the funds transferred to R&R and U.S. Benefits originated with the Debtor. As all of the elements necessary to establish a constructive trust are present in this case, Kozyak is entitled to the imposition of a constructive trust on the El Caballo Property.

G. Conclusion and Order

Ray Levy and First R&R were participants in the FinFed fraud. Ray Levy knew about and assisted in fraudulently obtaining funds from the investors. Most of the funds in First R&R's account at the time of the El Caballo Property purchase were obtained directly from the FinFed fraud. It is undisputed that at least $977,921 can be traced directly back to the Debtor. These funds were fraudulently obtained by First R&R and used to purchase the El Caballo Property. This is not a case of conversion of non-exempt to exempt assets, the use of a homestead to hinder, delay or defraud creditors, or use of a homestead which is connected to a criminal activity. This is a case involving the investment of fraudulently obtained funds directly to the homestead and thus, can be squarely decided within the holding of *Jones* which remains the law in Florida.

The imposition of an equitable lien in favor of Kozyak is necessary to prevent the Defendants from using the homestead exemption as an instrument of fraud and to prevent the Defendants unjust enrichment at the expense of the defrauded investors. An equitable lien will provide a means for Kozyak to recover at least a portion of the fraudulently obtained funds. The amount of the lien must be based upon the amount of funds obtained from the Debtor and used to purchase the El Caballo Property. The undisputed evidence reflects such amount to be no less than $977,921. This total dwarfs the present equity in the El Caballo Property which, without interest, is $523,635.94. Nevertheless, the Court will impose an equitable lien for the full amount of $977,921.[6] Based on the foregoing, it is

---

6. Kozyak presented undisputed evidence that a percentage of the funds transferred from U.S. Benefits to First R&R then used to purchase the El Caballo Property are also traceable directly back to the fraud. In that the $977,921 which was the amount transferred directly from the Debtor to First R&R and used to purchase the El Caballo Property more than exceeds the remaining equity pro-

ORDERED AND ADJUDGED as follows:

1. Kozyak's Motion for Summary Judgment on all Counts of the Complaint is granted.

2. Kozyak is entitled to an equitable lien and a constructive trust in the amount of $977.921.00.

3. The Defendants' homestead exemption shall not be a defense to any action taken by Kozyak to enforce his equitable lien/constructive trust against the equity proceeds by foreclosure, by separate order of this Court or otherwise.

4. Kozyak is entitled to all of the funds currently being held in escrow in the amount of $525,635.94 plus all accrued interest to date. Kozyak is directed to file a separate motion with notice to the escrow agent requesting the release of these funds to which request the Defendants are prohibited from asserting the defense of homestead exemption as set forth in paragraph 3 above.

5. The Court shall enter a separate final judgment in accordance with the findings and conclusions set forth herein.

ceeds, it is not necessary to calculate the U.S. Benefits amounts.